STATE OF NEBRASKA, APPELLEE, v. ORAL LONG, JR., APPELLANT.

139 N. W. 2d 813

Filed January 21, 1966. No. 36010.

Shrout, Hanley, Nestle & Corrigan, for appellant.

Clarence A. H. Meyer, Attorney General, and Harold Mosher, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ.

BROWER, J.

An information was filed in the district court for Dodge County, the first count of which charged the defendant, Oral Long, Jr., on June 13, 1964, with feloniously, forcibly, and by violence, taking from the person of Donna Miller money and personal property of value with intent to rob and steal. By a second count he was charged with making felonious assault on Donna Miller on the same day with intent to purposely, intentionally, and maliciously, but without deliberation and premeditation, kill her.

Defendant was found guilty by a jury of both crimes charged and was sentenced by the trial court to be imprisoned in the Nebraska Penal and Correctional Complex for a term of 10 years on each count, the sentences to run concurrently. This appeal is from an order of the trial court overruling the defendant's motion for a new trial.

In April or May 1964 the defendant became dissatisfied with his employment with the Campbell Soup Company. He saw an advertisement for a salesman by the Encyclopedia Britannica, and after an interview he was hired as such and shortly thereafter gave up his work for the Campbell Soup Company. The new employment consisted of making calls on prospective customers at their home in attempting to make sales of the encyclopedias on which he received a commission. This was his only compensation. At first he was accompanied by another salesman. The two of them called at the home of Donna Miller but were unable to make a sale. For 3 weeks thereafter his attempts to sell encyclopedias resulted in no sales and no compensation. Thereupon he terminated this employment but deceived his wife into believing he was still working.

Needing money he drove his car to the home of Mrs.

Miller on Saturday, June 13, 1964, arriving at approximately 8:20 p.m. He rang the doorbell and when Mrs. Miller appeared he inquired the location of Jensen Street of which he was aware at the time. Mrs. Miller recognized the defendant and proceeded to assist him in gaining the information, attempting to do so without leaving her door unlocked. She gave him her phone book and phoned the police department and ascertained the street's location. On giving the defendant the information she attempted to retrieve the phone book. In so doing she opened the door and before being able to lock it again the defendant charged her and succeeded in gaining entrance to the house. A struggle ensued in which defendant knocked Mrs. Miller down, beat her head against the wall, choked her, and slashed her throat with a pocket knife. For a time Mrs. Miller pretended to be unconscious. Defendant started to walk to the telephone. He saw Mrs. Miller's purse on a chair. From it he took her billfold containing $9.81 and put it in his pocket. When defendant went toward the phone, Mrs. Miller saw her chance to escape and ran out of the house to the neighbors for protection. Hearing the door slam, the defendant rushed out too, got in his car, and drove off.

There is no effort made to refute the facts hitherto outlined concerning the assault. The defendant himself testified to certain of the related incidents but states he has no memory concerning some of them. He concedes that is the way it must have happened.

The errors which defendant attributes to the trial court are in its finding that as a matter of law that there was sufficient evidence for the jury to conclude that defendant's confession, exhibit 15, was his free and voluntary statement; in failing to sustain defendant's objections to its admission because the defendant was deprived of his right to counsel; and in failing to give instruction No. 1 tendered by the defendant.

The evidence preceding the admission of the confes-

sion in controversy, heard by the court and jury without objection, shows that the defendant came to the Fremont police station at about 9:40 p.m., on June 13, 1964, accompanied by his wife. He appeared very pale and nervous and he looked "scared." He told patrolman Batten who was there at the time: " 'I am the party you think tried to kill that woman.' " At that time he asked: " 'She won't die, will she?' " He was then advised he was under arrest and officer Batten took him to the "traffic room" and conversed with him while waiting for lieutenant Hurt. Lieutenant Hurt and the county attorney arrived shortly thereafter. An officer testified the county attorney then advised defendant that he did not have to say anything and what he did say could be used against him. When asked if he understood this, he answered yes. The county attorney also then told him he was entitled to legal counsel. The county attorney then interrogated him at about 10:10 p.m., for approximately 8 minutes. Lieutenant Hurt and officer Franssen thereafter questioned him in the presence of the county attorney until 11:30 p.m. He was then allowed to rest. At 1:10 a.m., on the following morning, he was questioned by lieutenant Hurt for half or three-quarters of an hour. Police chief Millard was there only for the first 10 minutes. Then he was given a cup of coffee and allowed to rest. At 3 a.m., officer Franssen visited with the defendant but discussed only his children and his job. From 4:25 to 5 a.m., he was questioned again by lieutenant Hurt. At 6 o'clock defendant was given some milk and orange juice. He was questioned by the county attorney in the presence of officer Franssen at 7 a.m., "for an hour or so."

The admissions of the defendant contained in these early interrogations were testified to by the respective officers without objections in the first instance and were further brought out by defendant's counsel on cross-examination. As early as around 10:30 in the evening of June 13, 1964, he admitted going to the Miller residence

because he wanted to talk with someone. He then stated he remembered standing over Mrs. Miller, looking at her face, and seeing the blood which made him sick. He rushed out and drove to his father's home where he went to the bathroom to vomit. It was not until the interrogation beginning at 4:25 a.m., that he stated he went to Mrs. Miller's home to get money. During the several questionings the substance of the whole story hitherto related came out in these admissions. From what he said, the officers were enabled to find his knife in the street along the course he admitted driving and Mrs. Miller's billfold still containing the money in the trash barrel behind his father's home.

The defendant objects to the admission of the confession, exhibit 15, in evidence, claiming it was not shown it was voluntary. In this connection it is urged the defendant was at least emotionally disturbed which must be considered in connection with his claim that it was in fact coerced under the circumstances.

Previous to its admission, a psychologist had testified for the State that on the basis of several tests she had determined the defendant was of average intelligence and although moderately depressed had control of his emotional reactions more than an extremely impulsive individual did. She stated, however, he was emotionally immature, unstable under stress, resentful, and hostile. It was her opinion that "an irresistible impulse" is probably outside the realm of psychology.

Another physician and surgeon whose specialty was that of a psychologist, neurologist, and a consultant in psychiatry, also called by the State, said that on the basis of his examination and tests, including an electroencephalogram examination, the defendant knew right from wrong with reference to his acts on June 13, 1964. He found the defendant did have a psychiatric disorder. He classified his psychiatric reaction as "a character disorder, emotional unstable in a type." Also, the doctor testified the defendant had some depression.

The questioned confession was taken from the defendant at the office of the secretary of the county attorney at the courthouse in Fremont at approximately 8 p.m., on Sunday, June 14, 1964. The county attorney, officer Franssen, the court reporter, Derrold McCardle, and his friend, Gene Bay, who had accompanied him, were present. It was taken in shorthand and thereafter transcribed and is unsigned.

Officer Franssen testified that he had examined the confession and gone over the contents, and that to the best of his knowledge it was true in every detail and was exactly what was said by both the county attorney and the defendant. He said neither threats nor promises were made to the defendant. The reporter also testified that no threats or promises were made and that he correctly transcribed the conversation that took place.

At this point the jury was excused and the following occurred in its absence. The defendant testified he lacked 2 months of completing his last year in high school. The county attorney had told him he did not have to talk if he did not want to, but although he had thought and thought about whether the attorney had advised him if he could have counsel, he just did not remember if he did. Later he says he never asked for an attorney but was not told he could have one. Defendant says he got the idea the county attorney would do better for him than a lawyer. He thought it was cut and dried that he was "a goner." He states the county attorney went over and over his questioning until he finally got him to say what he wanted him to say. Describing his interrogation, he stated: "It seems like when they got done talking with me I went back to the County Jail or the City Jail. And I would shake just like this. I would get in there by myself and have to walk for a little bit to calm myself down and how long I walked, I don't know. I didn't have a watch. When I walked at least until I quit shaking. And then I would sit down and it seemed like at about the time I sat down somebody would come

back in and they would get me up and talk to me for awhile and then I would start shaking again when he left and then I would walk again and then someone else would come in."

His descriptions of the interrogations by the officers and county attorney in his quoted statement apparently refer to what happened during and previously to the questioning which took place at 7 o'clock Sunday morning which lasted an hour or two. From his testimony it would appear that he was not bothered later in this respect until 8 o'clock in the evening of Sunday, June 14, 1964. From what he says, however, his agitation continued whether interrupted by the officers or not. "Q- Let me ask you this final question. During the night of the 13th and 14th, you had no sleep? A- No. Q- But this statement was taken on the evening of the 14th? A- Yes. Q- Did you have any sleep during the day of the 14th? A- I really can't say I did and I can't say I didn't. I will try to go over the day of the 14th as I remember it after I had breakfast. Q- Alright. A- I remember I had that orange juice and I don't remember anybody talking to me after that. A couple of police officers took me out and got my stuff together and they brought me over to the County Jail here. The sheriff or the deputy, I don't remember which, took my things and logged me in and put me in a cell. I remember I paced the cell quite a bit and couldn't sleep. I got to the point where I couldn't stand up any more and I did try to lie down. I remember I tossed and I turned and I don't remember if I had noon dinner or not. I don't remember. I do recall having 1 meal after I had orange juice for breakfast. And I don't recall getting what you would call sleep. If I did sleep it was a sleep where all I could do was—I don't know how to say it."

The defendant's counsel read to him many portions of the questions and answers set forth in the confession in question. In some instances he said he did not remember giving the answers. In other instances when

asked by his counsel if he intended to so answer, he said he did not. At times he stated he might have so answered but if he did it was because the county attorney had through questioning indicated the way in which he should respond to the question and that he had no independent recollection of whether the answer was true or not.

In the defendant's testimony he stated that when he first came in he could not remember very much of anything. In fact he did not still. It was just like a bad dream. "And then every time I would say, well I am not sure or I don't know if this is true he (the county attorney) would say, 'You are a God damned liar'." In answer to the next questions he said that he distinctly remembers he called him such a liar once and maybe more.

Before the giving of the testimony of the defendant before the court alone, the defendant's counsel had made a motion to exclude the confession because it was an involuntary statement which shows upon its face that the defendant was not advised of his constitutional rights and is not in keeping with the law on confessions and constitutional rights. The trial court overruled the motion.

The defendant urges that subsequent testimony should have been considered by the trial court on the question of the exclusion of the confession. The record does not indicate it was not so considered at trial and so far as pertinent it will be considered by this court.

Later on cross-examination defendant said the county attorney called him a liar, using such oaths all night long. When asked if it was 50 or 100 times, he said it could have been 200. Subsequently he states that he remembers the county attorney calling him that once. He was then asked: "Q- Do you recall any other time I said this? A- No, sir. Like I said after that I just didn't pay too much attention to you. It was just that you thought I was a liar and whether or not you swore at

me all night long, I don't know. I had the feeling you did, but I don't know."

Defendant's father testified that on going to the police station with his son the defendant himself asked him not to go in with him. Thereafter on standing outside the station not far from a window he heard the county attorney say to his son, whom he could then see, " 'Don't lie about this, you little son of a bitch.' "

Both defendant's father and wife related incidents in defendant's life where he had acted strangely, impulsively, and without apparent good reason when agitated or crossed by others.

Dr. Chester H. Farrell, a qualified physician practicing in the field of neuropsychiatry, testifying for the defendant, said he had spent about an hour in examination of the defendant. This consisted of asking him questions and letting him talk while he sat back and tried to evaluate defendant's story. His conclusion was that the defendant was disturbed mentally. He felt the defendant was prone to develop episodes of mental disassociation and was unable to function for brief periods. The doctor stated on "Internal stress he acts out impulsively and without any ability to control his behavior for brief periods of time." He stated it was his opinion the alleged acts occurred in such a period. Although he stated he thought the defendant was mentally sane, he said: "I speak of this as an hysterical type of reaction. I think he has an hysterical personality and in his hysterical episodes he strikes out blindly and without any restraint and I think he is sick." The doctor stated defendant could not remember the date of the incident's occurrence. He remembered throwing away the purse but not going through it. The doctor seemed to base his opinion on the things the defendant could not remember. The doctor testified he had no opportunity to perform certain psychological tests to make certain the defendant was not faking. On redirect examination the doctor testified there was some possibility the defendant is schizophren-

ic although in cross-examination he had given it as his opinion that he was not.

The defendant cites the recent case of State v. Longmore, 178 Neb. 509, 134 N. W. 2d 66, wherein this court, after reviewing its own decisions and those of the courts of the United States, in its syllabi laid down the following rules in regard to the admissibility of confessions: "In a criminal trial a confession of guilt alleged to have been made by the defendant is not competent in evidence, unless first shown to have been voluntarily made.

"The court must first determine on evidence taken out of the presence of the jury, if there is objection to taking it in the presence of the jury, whether or not it has been sufficiently shown that the confession was voluntarily made. The question to be determined by the court is that of whether or not the affirmative evidence shows that the confession was voluntarily made and that this evidence excludes any other hypothesis. * * *

"The admission of the confession in evidence constitutes the court's independent determination that the confession is voluntary. * * *

"The question of whether or not in the first instance the State has laid proper and sufficient foundation for the admission of a confession is one of law for the court. If the court determines as a matter of law that no sufficient foundation has been laid, then the confession should be rejected, but where the confession is received in evidence, its voluntary character is still a question of fact for the jury.

"The use of any confession obtained in violation of the due process clause requires reversal of the conviction even though unchallenged evidence adequate to convict remains."

With these rules in mind we shall now evaluate the evidence before the trial court on which its ruling admitting the confession was based. To begin, there was a complete absence of any physical violence to the defendant. Also, it is not shown or contended that any

threats or promises were made to procure the confession. The contention seems to be that he was so badgered and worn out by questioning that he yielded up the answers desired by the county attorney without any recollection of his own. It is true that he was interrogated repeatedly by the officers during the night and morning following his arrest. It, however, appears the questioning was by no means continuous. He was allowed periods to rest although he asserts he was unable to do so. Moreover, the defendant was not annoyed during the day of Sunday, June 14, 1964, from early morning until on or about the time of giving the confession at 8 o'clock that evening. He claims that again he was restless and agitated and walked the floor. Although he remembers one meal after the morning, he does not know when he received it. It seems clear his agitation and inability to rest continued unabated after the cessation of the preceding night's questioning. It seems therefore to have arisen from the workings of his own conscience and not the treatment received at the hands of the officers or the county attorney. It is not surprising indeed that with the knowledge of what he had committed he was nervous, agitated, and unable to rest. A confession prompted by remorse and a gnawing consciousness of guilt is not because thereof inadmissible. Morcumb v. State, 125 Neb. 42, 248 N. W. 807.

According to the testimony of two witnesses, the confession was correctly transcribed by the reporter. This is not refuted. Accordingly an examination of the confession itself is proper. It shows the nature of the interrogation and throws some light on its voluntariness and the ability of the defendant to remember what occurred. In its important aspects the questions generally do not call for yes and no answers. The defendant's responses appear to be full and relate the incidents in some detail. There is little indication that the answers were given because of the suggestions of the interrogator. They appear to be free and voluntary. It is true some

details are not remembered but the salient facts are related quite clearly. At its beginning defendant was told he did not have to tell anything and whatever he said would be used against him. At its conclusion defendant testified he was neither threatened nor promised anything, but just told it would be better to tell the truth and not lie, and that he had told the truth. Moreover, the history of the assault related by defendant to his own psychiatrist, which was placed in evidence without objection, appears in most respects to correspond with the confession.

Defendant and his father testified that the county attorney used abusive language toward the defendant and this was not specifically refuted although no one else so testified. Defendant urges therefore this is reason for excluding the confession. It is generally held that abusive language alone in procuring a statement from the accused will not vitiate a confession. See Buschy v. People, 73 Colo. 472, 216 P. 519.

We conclude that the evidence affirmatively shows the confession was voluntarily made and excludes any other hypothesis. The trial court therefore did not err in admitting it in evidence subject to the consideration of the jury with respect to its being voluntary.

We will now consider the contention of the defendant that the confession could not be received in evidence because the defendant was deprived of his right to counsel. The record is quite clear that he never asked for counsel. The defendant himself so testified. The officer states affirmatively the county attorney told him he was entitled to an attorney. On defendant being first asked on direct examination if he was advised by the county attorney that he was entitled to counsel, he replied: "After this questioning was started out, I thought and I thought and I thought and I kept thinking of a T.V. program and I know it is supposed to be done and I tried to rack my mind. I even tried to remember last night if he did and I didn't. I don't recall. *If he said it I don't*

*remember it."* (Italics supplied.) Although thereafter he says he was not so informed it was only after other statements which show quite clearly he really had no remembrance concerning the matter. We do not think such testimony is sufficient to refute that of the officer.

In the case of State v. Longmore, 178 Neb. 509, 134 N. W. 2d 66, this court held: "A secret interrogation of a defendant charged with a felony, when the accused has asked for and been denied the presence of his counsel, is a violation of his constitutional rights."

The defendant cites the case of Escobedo v. Illinois, 378 U. S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977. He freely admits the facts there related are entirely different than those in the case before us because in that case the defendant already had counsel and each of them were attempting and demanding to see the other. Nevertheless defendant calls attention to the following general language from the opinion in that case: "We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer."

Defendant refers to cases from other jurisdictions from which he claims the rules stated in Escobedo v. Illinois, *supra,* have been extended to apply to the case before us. They include State v. Neely, 239 Or. 487, 398 P. 2d 482, but an examination of the opinion therein shows the court in that case concluded either that the defendant had asked about his right to counsel and was told that he could have one only after the completion of his interrogation, or had asked about counsel and was told he was entitled to it after the confession was made. Also, it appears the defendant in the cited case was never informed of his constitutional right to remain silent. The case has no application to the one before us. Defendant relies further on the case of People v. Dorado, 42 Cal. Rptr. 169, 398 P. 2d 361. In that case the defendant was not in-

formed of his right to remain silent, neither was he informed of his right to counsel. The judgment of the trial court was reversed because of the failure of the officer to inform the defendant of both of these rights. The California court did, with respect to the right to counsel, appear to extend the rule of Escobedo v. Illinois, *supra,* by holding an accused did not waive his right to counsel during the accusatory state in the absence of evidence that he knew of such right. Because of the difference in the facts we are not called upon to evaluate the merits of the rulings set forth in the cited case. We hold the evidence in the case before us shows the defendant was informed of his right to counsel. Where the accused was informed of his right to counsel and warned of his right to remain silent, and thereafter confesses to participation in a crime, there is no rule excluding the use of such a confession because of lack of counsel.

The last error assigned to the trial court is in failing to give defendant's tendered instruction No. 1. The defendant by that which was tendered sought to instruct the jury to return a verdict of not guilty by reason of insanity in the event it found the defendant had acted from irresistible impulse. In Bothwell v. State, 71 Neb. 747, 99 N. W. 669, this court stated: "The generally accepted test of responsibility for crime, is the capacity to understand the nature of the act alleged to be criminal, and the ability to distinguish between right and wrong with respect to such act. Schwartz v. State, 65 Neb. 196." The court in that opinion further stated: " 'The doctrine of moral insanity or uncontrollable impulse, upon which counsel seem mainly to rely, is not recognized in the jurisprudence of this state.' " Counsel for the defendant frankly concedes the rule quoted in Bothwell v. State, *supra,* is that which has obtained in this state and that it was set forth in the trial court's instructions. He urges, however, the rule should be changed. We are inclined to agree with the statement in the Both-

well case: " 'Capacity to comprehend the nature and moral quality of an act determines criminal responsibility. There is no other safe or practical test.' " The defendant's request to change the rule cannot be sustained.

Having carefully considered the case before us, we find no errors in the rulings of the trial court. Consequently its judgment must be and is affirmed.

AFFIRMED.