205 So.2d 298 (1967)
Richard VAN EATON, Appellant,
v.
STATE of Florida, Appellee.
No. 36381.
Supreme Court of Florida.
December 13, 1967.
*299 John E. Watson, St. Petersburg, for appellant.
Earl Faircloth, Atty. Gen., and Wallace E. Allbritton, Asst. Atty. Gen., for appellee.
DREW, Justice.
This appeal from a verdict of guilty and sentence of death presents two questions for determination. The first is whether this Court will continue to follow the M'Naghten "right and wrong" rule with relation to the defense of insanity in criminal cases, and the second is whether the jury determined the question of whether it would grant or withhold a recommendation of mercy in the same fair and impartial manner as the question of guilt or innocence.[1] We shall deal with the second question first.
The trial judge in his written charges to the jury[2] very carefully pointed out that it was to decide the case solely upon the evidence given from the stand and the law as charged by the court. In his concluding remarks the trial judge said:
"You should do your whole duty as citizens worthy of the high responsibility of citizenship and jury duty and leave the consequences where they rightfully belong. With your whole duty performed you have no concern with the consequences."
There is nothing in the general charge with reference to the impropriety of considering, in connection with the determination of the question of mercy, the probability or possibility of parole or pardon. In Burnette v. State[3] this Court dealt with a situation somewhat like that which appears in the record of this case and in that opinion stated:
"* * * In the trial of every capital case, therefore, as a part of his general charge concerning the power of the jury with reference to a recommendation of mercy, the trial judge should admonish the jury that provisions for probation, parole, pardon or commutation of convicted persons are incorporated in and are a part of the laws of this State; *300 that such laws are administered by public officials of this State in a manner authorized by the Legislature; that the question of whether mercy should be recommended is to be determined, under their oaths, in a fair and impartial manner, and that the question of whether the defendant would be subject to such procedures after conviction is a matter that they should not consider or discuss in connection therewith."
Had such a charge been included in the general charges of the eminent trial judge in this case, and had a copy of the written charges been delivered to the jury to be used in its deliberations, it is improbable that the question now presented would have arisen.
While this Court in Burnette suggested the giving of the charge before the case is submitted to the jury, we were careful to point out "that the failure to give such a charge would not, in itself and standing alone, constitute harmful error."[4] In that case the central question was not so much what was said by the trial court when the jury returned to the room for further instructions but what was not said. The brief and inadequate reply of the trial court quoted in that case could easily have been and probably was interpreted by the jury as meaning that the defendant there could possibly, even though convicted by the jury and sentenced to life imprisonment, be released from the penitentiary in a few months. In disposing of this question the court in that case very carefully pointed out the manner in which such a situation as there revealed had been dealt with in other courts. We said:
"* * * Some courts have held that when a situation arises such as exists in this case, the court should promptly declare a mistrial and submit the cause to another jury. Other courts have held that the jury should simply be instructed that the question of probation and parole was not a matter for their consideration and should not in any way influence them in the rendition of their verdict. Others have held that where the question is asked the court should fully and fairly advise the jury at length concerning the laws of the state with reference to probation and parole."
The opinion in that case rejected the view that a mistrial should be promptly declared and the cause submitted to another jury. We approved either of the other two methods, that is to say, advising the jury without further explanation that probation and parole was not a matter for its consideration or advising the jury fully and fairly concerning the laws of the state with reference to probation and parole. In that case we adhered to the well established, often repeated and universal rule that the mental processes by which a juror arrives at his conclusion in any given case is not a matter that may be inquired into. The basic question with which we are confronted in this case is whether after this cause was submitted to the jury and it returned to the courtroom the trial court properly charged the jury with reference to the question of probation and parole as outlined in the Burnette case, and, if so, whether such charge given after submission of the cause to the jury rather than in the general charges of the court constituted reversible error. In reaching a conclusion on this question we turn to the record in this case to see what actually did transpire.[5] We *301 have carefully examined the record and considered the events noted in the footnote and are of the view that the court charged the jury in accordance with the suggestions *302 of this Court in Burnette heretofore quoted. The language of the trial court's charge is quite similar to that suggested by this Court. It would have been the better practice as suggested in Burnette to have given a similar charge in the general charges of the court and to have sent the general charges to the jury for consideration in its deliberations. The failure to do so, however, in the light of the full charge of the court given in this case after the jury returned cannot be said to be erroneous or prejudicial to the defendant or to establish in any way that the jury did not try this issue in the same fair and impartial manner as it tried the issue of guilt or innocence. There is nothing in the record before us in this case or in the events which transpired in the courtroom after the submission to the jury, either by omission or commission, that is sufficient to overcome the presumption that the jury faithfully discharged its duties in accordance with the charges of the court. Any contrary conclusion on the record here would necessarily be predicated upon supposition as to the mental processes of the jury in arriving at its verdict.
We now direct our attention to the remaining issue.
The psychiatrist produced as a witness for the defendant in this case testified that the defendant Richard Van Eaton had "a sociopathic personality disturbance. Antisocial in type." When asked to describe a person having such mental condition, the psychiatrist said:
"Well, [he is] a person that doesn't respect society, and doesn't abide by the rules and regulations of the laws that society presents to the individual to follow. And these people consistently get into difficulty because they are not able to profit by any experiences when they do something that is wrong. Apparently they forget the pain that they went through, or they rationalize and they just continue to continually make the same mistake over and over again."
Further the psychiatrist stated that it was possible that such an individual could have planned and premeditated the murder of the victim in this case. The psychiatrist was unequivocal in his testimony that the defendant knew right from wrong, the requirement of the M'Naghten rule which has been consistently and uniformly applied as the law of this state for more than 100 years.
While the testimony of the psychiatrist was somewhat inconclusive on the question of "irresistible impulse", it could be said from an examination of all of his testimony that it was his opinion that, while the defendant in this case knew right from wrong and was legally sane when measured by the M'Naghten rule, he was, because of mental disease, incapable of controlling his actions. This witness stated in part:
"Q. In other words he knew right from wrong at the time he committed the offense?
A. Yes, he knew right from wrong, but I don't know if he could control it.
Q. You are talking about impulse?
A. The impulse, yes, sir."
The testimony of the psychiatrist seems to us to establish the existence of what is commonly referred to as a "violent and ungovernable temper" rather than a mental *303 disease making it impossible for the defendant to resist the impulse to commit an act which he recognizes as wrong.[6] Even if we were inclined in this case  which we are not  to recede from or to further amplify or supplement the M'Naghten rule as has been done in some other states, and extend it to include cases involving the "irresistible impulse" theory, the jury in this case could well have concluded from the evidence before it that this defendant did not fall in that category. The evidence of the psychiatrist on this question is wholly inconclusive and such a finding of the jury would certainly be supported by sufficient evidence.
It is argued to this Court that the M'Naghten rule is outdated and should be replaced by a rule more consistent with modern knowledge in the field of insanity.[7] There has been no subject in the field of law that has provoked more extended discussions than the M'Naghten rule and the many other rules which have grown out of this early case. Volumes have been written upon the subject and it is one which today is an unsettled as it was in the beginning.[8] Moreover, as recently as in 1960[9] this Court was urged to abandon the "right or wrong" test (the rule in M'Naghten) in favor of the "irresistible impulse" or "moral insanity" test adopted by New Hampshire and the similar rule adopted by the court of appeal for the District of Columbia. In disposing of this question there we said:
"Counsel for defendant has done an outstanding job of researching this question and in presenting his views, both in his brief and before this Court. Yet we have not been convinced that the M'Naghten rule is not the best available rule for measuring the mental condition of the individual in terms of accountability for criminal acts. We therefore adhere to the Rule in M'Naghten's case as do all other jurisdictions except the two above mentioned."
Once again we reaffirm our adherence to the rule we have consistently followed and for the same reasons so ably expressed by Mr. Justice O'Connell in Piccott.
We feel required in this connection, however, to discuss the holding of the District Court of Appeal of the Second District in Reid v. Florida Real Estate Commission[10] *304 and particularly the following statement extracted from that opinion:
"Although `irresistible impulse' and `moral insanity' do not exist as categorical defenses in Florida, yet it has been held in a border-line case that, under Florida law, a person is entitled to acquittal on the ground of mental incapacity if at the time of the commission of the act he either did not know the difference between right and wrong or he was unable to refrain from doing wrong; and it is not necessary that both conditions be present. Thus if it is established from the evidence that as the result of some mental defect or disease a person was unable to refrain from doing wrong, such as transporting a forged check in Interstate Commerce, he could not be held criminally responsible notwithstanding he did not deny the commission of the act nor deny that he knew the difference between right and wrong. Argent v. United States, supra [5 Cir., 325 F.2d 162]."
The quotation above is apparently based upon the holding of the Federal District Court in the quoted case. The Federal District Courts follow generally the holding in the two Davis cases[11] but the decisions of the various Federal Circuit Courts have not been uniform on the subject, and the United States Supreme Court, although requested on numerous occasions, has never seen fit to change or reverse the rule announced in Davis. The irresistible impulse rule, however, has never been followed in this jurisdiction; therefore the language of the Second District quoted above which could be construed as approving the irresistible impulse rule is hereby disapproved.
The sufficiency of the evidence in this cause to support the verdict of the jury and the judgment of the court has not been questioned by appellant. We have, nevertheless, in accordance with the requirements of law examined the record, including the evidence, in detail and we find that the verdict is amply supported by the record and evidence and that the interests of justice do not require a new trial.
Affirmed.
CALDWELL, C.J., THOMAS, ROBERTS and ERVIN, JJ., SPECTOR, District Court Judge, and WHITE, Circuit Judge (Retired), concur.
NOTES
[1] Singer v. State, Fla. 1959, 109 So.2d 7; Burnette v. State, Fla. 1963, 157 So.2d 65.
[2] It does not appear from the record whether the written charges were delivered to the jury for use in the jury room as authorized by F.S. 1967, 919.04 (2), F.S.A.
[3] Note 1, supra.
[4] Text 157 So.2d 70.
[5] The first time the jury returned to the courtroom the following occurred:

"THE COURT: Have your same seats, please.
Ladies and gentlemen, have you elected a foreman or spokesman?
MR. ADCOCK: Yes, sir.
THE COURT: Mr. Adcock, I understand you have a question, sir?
MR. ADCOCK: Yes, sir. Several of the jurors, your Honor, are wondering about guilty of murder in the first degree and a majority of us recommend him to the mercy of the Court, they wonder what the mercy of the Court will consist of?
THE COURT: It will be a mandatory sentence to life imprisonment.
MR. ADCOCK: They want to know will it be life and not a possibility of parole maybe in 10 or 15 years?
THE COURT: Let me say this to you, ladies and gentlemen. You will recall and you will read in those charges in the first instance that with your whole duty performed as you see it in the light of the law you really shouldn't be concerned with the consequences.
I can say this further. That the administration and execution of sentences lawfully imposed are dependent on the duties involved within the authority of the executive department of the State. That is to say the Governor and the cabinet members making up the pardon board. The director of Division of Correction who is in charge of all correctional institutions, and/or the Florida Parole and Probation Commission.
That I think is as far as I am authorized to say.
Again I reiterate that with your whole duty performed as you see it in the light of the law you really ought to have no concern with the consequences.
MR. ADCOCK: Does that satisfy you?
THE COURT: As a matter of fact in truth it would be impossible for me to say what the consequences will ultimately be. They would [sic] conjectural in any event.
MR. ADCOCK: Does anyone have any questions? Thank you, your Honor.
THE COURT: All right.
(THEREUPON, THE JURY RETIRED FROM THE COURTROOM.)"
Shortly thereafter the jury returned for a second time, whereupon the following occurred:
THE COURT: Bring the panel back, please, sir.
(THEREUPON, THE JURY RESUMED THE JURY BOX.)
THE COURT: Mr. Adcock, ladies and gentlemen, I understand you have another question to ask of the Court.
MR. ADCOCK: Yes, your Honor. Several of them are concerned about whether the defendant would have automatic appeal on a decision that we render or whether he will not have a chance of appeal. That is the big question.
THE COURT: Well, Mr. Adcock, ladies and gentlemen, let me say this to you. I am certain that the jury is conscientiously evaluating their duty in this case. Now this is the second time that the jury has come in to ask the Court a question, and it is apparent to the Court that the jury may well be concerned with the consequences of its verdict.
I can say this. That the trial Court is only one level of our system of jurisprudence. And certainly there are appellate courts. It cannot be presumed, however, that the proceedings which are transpired in this trial court will be overturned or reversed for any reason. Quite the contrary, the presumption is the other way. That the proceedings here are regular and proper. This Court proceedings in every respect are of course reviewable under appropriate appellate processes.
However, I reiterate, Mr. Adcock and ladies and gentlemen, and request that you reread the charges in this regard, that having been fully charged on the law of this case and having evaluated the evidence and weighed the sufficiency in the light of the law, that you determine your verdict and do your duty as you conscientious [sic] believe it to be, that you have no concern with the consequences.
The duty then devolves upon others to carry out the mandates of your verdict. Whatever it may be. And of course it is presumed that you will, and I know you will conscientiously do your duty under the law as you feel it must be done.
Now that is all I can say in this regards.
Does either of you gentlemen wish to confer with your foreman for perhaps clarification of the comments I have just made?
You can feel free to do so. Any of you.
MR. ADCOCK: Thank you, your Honor.
THE COURT: Thank you, Mr. Adcock.
Ladies and gentlemen, now if any time you wish refreshments or libation or you wish a moment of relaxation, don't hesitate to call it to the attention of the bailiff. While you must remain in his custody and together. Incidentally, I might add, it is suggested that if any of you  there is a rest room in the jury room, that if any of you is not present, that none of your deliberations ought to be undertaken except in the presence of each of you.
MR. ADCOCK: Yes, sir.
(THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)"
The jury returned to the courtroom for a third time for the sole purpose of having the testimony of Dr. Spoto, the psychiatrist, reread. On the jury's fourth return to the courtroom, it rendered its verdict of guilty without a recommendation of mercy.
[6] The following is from the psychiatrist's testimony:

"A Well, I found him to be quite suspicious and hostile. And he gave a history of numerous encounters with the law, dating back to the late 40's. And he seemingly had more difficulty with the law in the last couple of years. From the way he described himself, and I think he has a pretty good idea of part of his problem, although he is not capable of doing anything about it. He is unable to control his temper. His impulses. He becomes so angry and upset that he loses all control. And during these periods I don't think he really knows what he is doing. And there are times when he claims he has had blackouts. That he doesn't remember what he does. He has gotten into all kinds of difficulties. Been involved in all kinds of fights. He has been cut. Shot. He had a bad conduct discharge from the Navy. And this was I think due to his impulsivity. And he has also had a past history of having been hit in the head quite a number of times."
[7] See dissenting opinion of Hobson, J., deceased, in Piccott v. State, Fla. 1959, 116 So.2d 626.
[8] See M'Naghten is Dead  or is it?" Houston L.Rev., Vol. 3, Number 1, Spring Summer 1965, p. 58. In this article we find the following statement particularly concerning the rules in the Federal Circuit Court of Appeal: "The rules of the various circuits and authorities would leave anybody dizzy with frustration." Also see Criminal Responsibility: Florida Legislative Reform of M'Naghten, University of Florida L. Rev. XIX, Number 12, Summer 1966, p. 137.
[9] Piccott v. State, Fla. 1959, 116 So.2d 626.
[10] Fla.App. 1966, 188 So.2d 846.
[11] Davis v. United States, 1895, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499; Davis v. United States, 1896, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750.