276 So.2d 17 (1973)
Earnest Eugene ANDERSON, Appellant,
v.
STATE of Florida, Appellee.
No. 41755.
Supreme Court of Florida.
March 28, 1973.
Charles D. Edelstein, Miami, for appellant.
Robert L. Shevin, Atty. Gen. and Michael M. Corin, Asst. Atty. Gen., for appellee.
PER CURIAM.
This is a direct appeal from a jury verdict finding Appellant Earnest Eugene Anderson guilty of first degree murder without recommendation of mercy. We have jurisdiction. Art. V, Section 2(a), Fla. Const., F.S.A.; Anderson et al v. State, Fla. 1972, 267 So.2d 8.
The following facts pertinent to the homicide were stipulated to at trial. Four teenage boys, including the deceased, Nathaniel Pollock, left a restaurant in an automobile and drove to Pollock's house. As they parked the car, Anderson, another teenager, approached them and said, "Nate, come here." Pollock got out of the car. The Appellant walked up to him and asked, "Why did you sick the dog on me?" Anderson then shot Pollock once between the eyes, killing him. Following the shooting, Anderson wiped off the gun, put it in Pollock's left hand, and announced to the other three boys that it was an accident and that Pollock killed himself. The police were called and Anderson was arrested. It is not known whether Pollock ever "sicked a dog" on him.
Several months after the arrest, two court-appointed psychiatrists determined Anderson was incompetent to stand trial. He was committed to the South Florida State Hospital for approximately one year, after which time he was returned to the Dade County Jail. Shortly thereafter he was tried.
Anderson's jury trial was short. It consisted solely of the stipulation of facts, each side's opening statements, the testimony of *18 two psychiatrists called by the defense, one court-appointed and one from the South Florida State Hospital, and the closing statements. The trial court instructed the jury that it could find the defendant guilty of first, second, or third degree murder, or manslaughter, or it could return verdicts of not guilty or not guilty by reason of insanity. The jury found Anderson guilty of first degree murder without recommendation of mercy.
On appeal to this Court, Appellant raised six issues. Two, involving the death penalty, are now moot, Furman v. Georgia, 1972, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346; we previously reduced Appellant's death sentence to life imprisonment. Anderson, et al. v. State, supra. Two other issues involved questions of fact which were properly left to the jury's determination. The remaining two questions presented here are:
I. Whether the M'Naghten test for insanity is arbitrary, unreasonable and obsolete, and,
II. Whether the trial court erred in failing to charge the jury as to the definition of "premeditated design."
Florida has expressly followed the M'Naghten Rule since 1902. Davis v. State, 1902, 44 Fla. 32, 32 So. 822. See, e.g., Piccott v. State, Fla. 1959, 116 So.2d 626; Van Eaton v. State, Fla. 1967, 205 So.2d 298; Holston v. State, Fla. 1968, 208 So.2d 98, and Campbell v. State, Fla. 1969, 227 So.2d 873, cert. dismissed, 400 U.S. 801, 91 S.Ct. 7, 27 L.Ed.2d 33. We seem to have done so for lack of a better alternative. In Piccott v. State, supra, 116 So.2d at 627, we said:
"... we have not been convinced that the M'Naghten rule is not the best available rule for measuring the mental condition of the individual in terms of accountability for criminal acts. We therefore adhere to the Rule in M'Naghten's case as do all other jurisdictions except [New Hampshire and the United States Court of Appeals for the District of Columbia Circuit] ..."
In 1967 in Van Eaton, supra, 205 So.2d at 303, we said, "Once again we reaffirm our adherence to the rule [M'Naghten] we have consistently followed and for the same reasons so ably expressed by Mr. Justice O'Connell in Piccott." Once again we reaffirm our adherence to M'Naghten.
We now turn to the second question. The given charge, in its entirety, was:
"Murder in the first-degree is the unlawful killing of a human being, when perpetrated from a premeditated design to effect the death of the person killed or any human being, or when committed in the perpetration of or in the attempt to perpetrate any arson, rape, robbery, burglary, abominable and detestable crime against nature or kidnapping."
"Premeditation" was not defined nor its meaning, as used in the charge, explained to the jury. We are in agreement with the District Court of Appeal, Second District, which has said:
"It is rudimentary, and should require no citation of authority, that the one essential element which distinguishes first-degree murder from second-degree murder is premeditation. The term `design' as mentioned in each of the two degrees, means the specific intent to kill, and in second-degree murder such specific intent may, or may not, be present. The difference is, that in second-degree murder, if it is present, it is not premeditated. Thus, premeditation is the ever-present distinguishing factor; and no doubt should be left in the minds of the jury as to its complete and full legal import. No door should be left open for confusion as to what it means. Without the full and complete definition of premeditation, the jury would have neither an understanding of what they were looking for to determine it, nor what to exclude to reject it." Polk v. State, Fla.App., 1965, 179 So.2d 236.
*19 Failure to define "premeditation" in a first degree murder charge is reversible error, even where no objection was made by the defendant. Rule 6.16, F.A.R. (a) and (b), 32 F.S.A.
The cause is reversed and remanded to the Circuit Court of Dade County for a new trial.
CARLTON, C.J., and ROBERTS, McCAIN, JJ., and DREW, J. (Retired), concur.
ERVIN, J., dissents in part and concurs in part with opinion.
BOYD, J., concurs in part and dissents in part with opinion.
DEKLE, J., dissents with opinion.
ERVIN, Judge (dissenting in part, concurring in part):
I must respectfully dissent. Florida courts have traditionally used the "M'Naghten Rule" when instructing juries on insanity; it requires a finding that a defendant was sane at the time of criminal activity if he knew the difference between right and wrong at the time he committed the crime.[1] The rule has its origins in ancient tests of criminal insanity; the Eirenarch of 1582, absolving from criminal responsibility "a man or a natural fool, or a lunatic in the time of his lunacy, or a child who apparently has no knowledge of good or evil," and the "Wild Beast" test of 1724 providing "for exculpation if the defendant `doth not know what he is doing, no more than * * * a wild beast.'" United States v. Freeman, 2d Cir.1966, 357 F.2d 606, 616; State v. White, 1969, 93 Idaho 153, 456 P.2d 797. The rule obtained its current name and language following the 1843 trial of one Daniel M'Naghten, an Englishman with a persecution complex, who attempted to assassinate Robert Peel, the Prime Minister of England. By mistake, M'Naghten killed Peel's secretary. M'Naghten was tried and found not guilty by reason of insanity. The defense based a large portion of its case upon the 1838 work of Dr. Isaac Ray entitled Medical Jurisprudence of Insanity, and "the court was so impressed with this and other medical evidence of M'Naghten's incompetency that Lord Chief Justice Tindal practically directed a verdict for the accused." United States v. Freeman, supra, 357 F.2d at 617. The verdict, however, enraged Queen Victoria, who directed the House of Lords to call the fifteen judges of the common law courts into session to answer certain questions regarding criminal responsibility. The judges gave their Queen the reply she wanted, and
"Significantly, it was Lord Chief Justice Tindal who responded for fourteen of the fifteen judges, and thus articulated what has come to be known as the *20 M'Naghten Rules or M'Naghten test. Rather than relying on Dr. Ray's monumental work which had apparently impressed him at M'Naghten's trial, Tindal, with the Queen's breath upon him, reaffirmed the old restricted right-wrong test despite its 16th Century roots and the fact that it, in effect, echoed such uninformed concepts as phrenology and monomania."[2] United States v. Freeman, supra, 357 F.2d at 617.
Because of an angry Queen, therefore, the M'Naghten Rule became the common-law test for criminal insanity, even though at the time of its adoption the "right-wrong" concept of criminal responsibility was becoming obsolete. Almost every United States jurisdiction followed M'Naghten; the sole nineteenth century exception seems to be New Hampshire, which in State v. Pike, 1870, 49 N.H. 399, approved an instruction permitting a finding of insanity if the jury found the defendant suffered a "mental disease" which was responsible for his criminal act.
The first twentieth century break from M'Naghten came in 1954 with a decision of the United States Court of Appeal for the District of Columbia Circuit. Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862. That decision adopted what has become known as the Durham rule, i.e., "an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect." Id. at 874-875. It is virtually identical to the 1870 New Hampshire test.
Florida has expressly followed the M'Naghten Rule since 1902. Davis v. State, 1902, 44 Fla. 32, 32 So. 822. See, e.g., Piccott v. State, Fla. 1959, 116 So.2d 626; Van Eaton v. State, Fla. 1967, 205 So.2d 298; Holston v. State, Fla. 1968, 208 So.2d 98, and Campbell v. State, Fla. 1969, 227 So.2d 873, cert. dismissed, 400 U.S. 801, 91 S.Ct. 7, 27 L.Ed.2d 33. We seem to have done so for lack of a better alternative. In Piccott v. State, supra, 116 So.2d at 627, we said:
"... we have not been convinced that the M'Naghten rule is not the best available rule for measuring the mental condition of the individual in terms of accountability for criminal acts. We therefore adhere to the Rule in M'Naghten's case as do all other jurisdictions except [New Hampshire and the United States Court of Appeals for the District of Columbia Circuit] ..."
In 1967 in Van Eaton, supra, 205 So.2d at 303, we said, "Once again we reaffirm our adherence to the rule [M'Naghten] we have consistently followed and for the same reasons so ably expressed by Mr. Justice O'Connell in Piccott."
Our Piccott reasoning is no longer valid; courts have stopped blindly following M'Naghten and in so doing they have severely criticized it. There are four tests of criminal insanity currently in use in this country: M'Naghten, Durham, the irresistible impulse addition to M'Naghten exculpating from criminal responsibility a defendant who knows right from wrong but because of a mental illness is unable to refrain from wrongful action, and the American Law Institute test providing:
"(1) A person is not responsible for criminal conduct if at the time of such *21 conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [or wrongfulness] of his conduct or to conform his conduct to the requirements of law.
"(2) The terms `mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." Model Penal Code § 4.01 (Tent.Draft No. 4, 1955)
Our research shows that at this time 35 states still adhere to M'Naghten[3] (however, approximately half that number add an irresistible impulse, or similar, test), while two follow a Durham-type rule[4] and 12 have adopted the American Law Institute's test.[5] In addition, 8 of the 10 Federal Circuit Courts (excluding the District of Columbia with its Durham rule) have expressly adopted the ALI rule,[6] and the remaining two have indicated their approval.[7] *22 The Supreme Court of the United States has not considered the issue since its 1897 decision in Davis v. United States, 1897, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750, where it approved M'Naghten.
Because of this growing opposition to M'Naghten, I feel it is time to reassess our reliance upon it.
Two major objections to the rule are consistently raised by M'Naghten critics, the primary one being that it considers only the cognitive, and never the volitional, aspects of personality. See, e.g., 44 Tul. L.Rev. 192 (1969); 20 Drake L.Rev. 353 (1971); Platt, Choosing a Test for Criminal Insanity, 5 Willamette, L.J. 553 (1969); State v. White, supra; Wade v. United States, supra, and United States v. Currens, supra. Under M'Naghten, if a man knows the difference between right and wrong he is considered sane; the degree of his awareness and his ability to control his behavior are immaterial. This is an anathema to modern psychiatry.
As long ago as 1930 Mr. Justice Cardozo, in his book What Medicine Can Do For The Law, said, "Everyone concedes that the present definition of insanity has little relation to the truths of mental life." Sobeloff, Insanity and the Criminal Law: From M'Naghten to Durham, and Beyond, 41 ABAJ 793 (Sept. 1955). Former Solicitor General of the United States, Simon E. Sobeloff, has said:
"Only the drooling idiot can be said to have no knowledge of right and wrong, and he almost never gets into the criminal court. Judging the issue of insanity according to the right-wrong test exclusively is like saying as a matter of law that the only acceptable symptom in defining appendicitis is a pain in the abdomen and that no other diagnostic symptom is valid." Sobeloff, Insanity and the Criminal Law, supra.
The Committee on Psychiatry and the Law of the Group for the Advancement of Psychiatry recommended the abolition of M'Naghten, saying:
"The law ... does not allow the psychiatrist to communicate his unique understanding of psychic realities to the Court and Jury. More often, the mutual quest for the `whole truth' cannot get past a barrier of communication which leaves the psychiatrist talking about `mental illness' and the lawyer talking about `right and wrong.'" United States v. Currens, supra, 290 F.2d at 766.
The author of a memorandum contained in Appendix B to Section 4.01 of the Model Penal Code stated that he:
"sent a questionnaire on medicolegal problems to the members of the American Psychiatric Association two years ago, one question of which was: Do you believe the right and wrong concept as promulgated by the M'Naghten case is satisfactory? Of the more than three hundred psychiatrists who answered this question, only twelve percent answered categorically that it was a satisfactory concept, while seventy-nine percent believed it to be unsatisfactory.
"A somewhat similar questionnaire was sent in 1951 to members of the Group for the Advancement of Psychiatry, an organization composed of one hundred and fifty psychiatrists, most of whom are active in moulding current psychiatric opinion in this country. The answer to the inquiry, `In your candid estimate do you avoid testifying in criminal cases?' were `Yes' sixty-eight, `No' thirteen. To the question appearing in the section dealing with responsibility, which read: `Do you believe the test questions enable the psychiatrist to present a realistic and adequate statement of the medical facts?', the answers were, `Yes' four, `No' seventy-five, `Don't know,' seven."
Because M'Naghten unrealistically considers mentally ill only those who are unable *23 to distinguish right from wrong, many defendants with severe mental defects receive guilty rather than not guilty by reason of insanity verdicts. This does nothing to accomplish the two goals of criminal punishment, the maximum rehabilitation of criminals and the protection of society, against crime. Diamond, Criminal Responsibility of the Mentally Ill, 14 Stanford L.Rev. 59 (1961). The end result is usually the opposite, and this is the basis for the second major objection to M'Naghten. Mentally ill defendants are found guilty under the rule and placed in prisons without psychiatric facilities; mental rehabilitation is impossible. When they have finished serving their sentences, they are released to society, uncured and ready to unwittingly commit another crime. It would be far better to have such persons initially committed to a hospital where they could be treated and held until such time as they recovered from their mental illnesses. "The throwing of the mentally ill individual from the jail back into the community, untreated and uncured, presents a great and immediate danger." United States v. Currens, supra, 290 F.2d at 767.
The instant case is an excellent example of the inability of M'Naghten to adequately define mental illness. Anderson, in front of three witnesses, walked up to a boy, shot him between the eyes, wiped off the gun, placed it in his victim's hand, and announced that the decedent killed himself. The only witnesses testifying at this trial, two psychiatrists, said that Anderson suffered from a major mental illness, schizophrenic psychosis, paranoid type,[8] and could not have known the difference between right and wrong at the time of the murder. Yet he was found sane, apparently because the jury believed the State's closing argument that he would not have wiped his fingerprints off the gun and placed it in his victim's hand had he not known that what he was doing was wrong.
Here is a perfect example of a mentally ill person who is legally sane simply because a jury felt he knew the difference between right and wrong. Our mental institutions are filled with others who can make that distinction. United States v. Currens, supra, 290 F.2d at 765. It is a small part of the overall picture of a defendant's mental condition.
In this age of increasing psychiatric sophistication, it is naive to believe a determination as to a person's sanity can be made solely on the basis of his ability to distinguish right from wrong. A jury should be given a defendant's entire mental record if he raises the issue of his sanity; M'Naghten makes this impossible. In addition, the jury should be charged in a manner which would allow it to find a defendant not guilty by reason of insanity not only when he does not know that what he is doing is wrong but also when he cannot control his actions because of a mental disease.
I believe the time has come to discard M'Naghten; and I feel the best replacement *24 is the Model Penal Code Test of the American Law Institute. It is not enough to merely add the "irresistible impulse" test to M'Naghten; it is condemned by psychiatrists who cannot agree as to whether such impulses actually exist. Platt, Choosing a Test for Criminal Insanity, supra; Wade v. United States, supra. Furthermore, it appears to be "restricted to sudden, spontaneous acts as distinguished from insane propulsions that are accompanied by brooding or reflection." Comments, § 4.01, Model Penal Code, supra; 44 Tul.L.Rev., supra. I also do not feel the Durham rule is an adequate replacement; it contains no standards for the jury to use in assessing the defendant's criminal responsibility. United States v. Currens, supra; Wade v. United States, supra.
If we adopted the American Law Institute's rule, we would join those jurisdictions, feeling it has an
"appropriate balance between cognition and volition, [and] it demands an unrestricted inquiry into the whole personality of a defendant who surmounts the threshold question of doubt of his responsibility." United States v. Chandler, supra, 393 F.2d at 926.
It should enable juries to more realistically assess a defendant's criminal responsibility in light of his claimed mental defects.
I would reverse Appellant's first degree murder conviction and remand this cause for new trial; at that time the jury could be charged under the American Law Institute's test for criminal responsibility. The new trial should be ordered for two reasons. Not only is the M'Naghten Rule antiquated and totally insufficient in this case, but also there is reversible error in the trial court's instruction on first degree murder.
The given charge, in its entirety, was:
"Murder in the first-degree is the unlawful killing of a human being, when perpetrated from a premeditated design to effect the death of the person killed or any human being, or when committed in the perpetration of or in the attempt to perpetrate any arson, rape, robbery, burglary, abominable and detestable crime against nature or kidnapping."
There was no definition of "premeditation" given. I am in agreement with the majority and the language which they quoted from Polk v. State, Fla.App. 1965, 179 So.2d 236. Failure to define "premeditation" in a first degree murder charge is reversible error, even where no objection was made by defense counsel.
Insofar as the majority opinion agrees to a reversal because of insufficiency of the charge on premeditation I concur; in its other respects I disagree to the majority opinion.
BOYD, J., concurs.
BOYD, Judge (concurring in part, dissenting in part).
I concur in the majority opinion that failure to define premeditation to a jury in a charge on first degree murder is reversible error.
I must dissent to the majority view in re-adopting the M'Naghten rule on defendants pleading insanity. Surely with all the modern advances in court procedures and the abandonment of antiquated approaches to justice the time has come to adopt a better standard than the M'Naghten rule which holds that persons who know right from wrong are sufficiently sane to be punished for their crimes.
Judges and juries in deciding factual matters should have the benefit of all available scientific data relating to the mental capacities of persons relying upon defenses of insanity and have wide latitude in determining whether such persons are sufficiently sane to be accountable for their crimes. Only a raving idiot is unable to know right from wrong.
*25 The standards of American Law Institute[1] should be adopted.
The opinion filed herein by ERVIN, J., should be adopted.
ERVIN, J., concurs.
DEKLE, Judge (dissenting).
Under the coldblooded facts in this case which demonstrate a clear, calculated and deliberate killing, there was no error in my view in the charges or judgment.
I would affirm. I agree that the M'Naghten Rule should be retained.
NOTES
[1] The specific insanity charge in the instant case was as follows:

"One of the defenses asserted in this case is that of not guilty by reason of insanity at the time of the alleged crime.
"Under the law a person is sane and responsible for his crime if he has sufficient mental capacity to understand what he is doing and to understand that his act is wrong. If at the time of an alleged crime a defendant was, by reason of mental infirmity, unable to understand the nature of his act or its consequences, or was incapable of distinguishing that which is right from that which is wrong, he was legally insane and should not be convicted.
"Insanity may be permanent, temporary, or intermittent. It is for you to determine the question of the sanity of the defendant at the time of the alleged commission of the crime.
"Until the contrary is shown by the evidence, the defendant is presumed to be sane.
"It is sufficient as a defense of insanity if the evidence raises in the minds of the jurors a reasonable doubt as to the sanity of the defendant at the time of the alleged crime and, if such reasonable doubt is raised, it is your duty to find him not guilty."
[2] According to the Freeman court, "In the pre-M'Naghten period, the concepts of phrenology and monomania were being developed and had significant influence on the right and wrong test. Phrenologists believed that the human brain was divided into thirty-five separate areas, each with its own peculiar mental function. The sixth area, for example, was designated `destructiveness.' It was located, we are told, above the ear because this was the widest part of the skull of carnivorous animals. Monomania, on the other hand, was a state of mind in which one insane idea predominated while the rest of the thinking processes remained normal. Of course, both phrenology and monomania are rejected today as meaningless medical concepts since the human personality is viewed as a fully integrated system." United States v. Freeman, supra, 357 F.2d at 616.
[3] Alabama, Barbour v. State, 1954, 262 Ala. 297, 78 So.2d 328; Alaska, Chase v. State, Alas. 1962, 369 P.2d 997; Arizona, State v. Malumphy, 1969, 105 Ariz. 200, 461 P.2d 677; Arkansas Bell v. State, 1915, 120 Ark. 530, 180 S.W. 186; California, People v. Wolff, 1964, 61 Cal.2d 795, 40 Cal. Rptr. 271, 394 P.2d 954; Colorado, Early v. People, 1960, 142 Colo. 462, 352 P.2d 112; Delaware, Mills v. State, Del. 1969, 256 A.2d 752; Florida, Campbell v. State, Fla. 1969, 227 So.2d 873, cert. dismissed, 400 U.S. 801, 91 S.Ct. 7, 27 L.Ed.2d 33; Georgia, Clark v. State, 1968, 224 Ga. 311, 161 S.E.2d 836; Hawaii, § 703-4, Hawaii Rev.Stats. 1968; Iowa, State v. Carstens, Iowa 1970, 182 N.W.2d 119; Kansas, State v. Coltharp, 1967, 199 Kan. 598, 433 P.2d 418; Louisiana, State v. Brodes, 1925, 160 La. 340, 107 So. 131; Michigan, People v. Martin, 1971, 386 Mich. 407, 192 N.W.2d 215; Minnesota, § 611.026 Minn.Stats. 1971 (the Minnesota Supreme Court is opposed to M'Naghten, and has stated that it would like § 611.026 Minn. Stat. repealed so it could adopt a better rule, State v. Dhaemers, 1967, 276 Minn. 332, 150 N.W.2d 61); Mississippi, Moore v. State, Miss. 1970, 237 So.2d 844; Nebraska, State v. Long, 1966, 179 Neb. 606, 139 N.W.2d 813; Nevada, Williams v. State, 1969, 85 Nev. 169, 451 P.2d 848, cert. denied, 396 U.S. 916, 90 S.Ct. 239, 24 L.Ed.2d 194; New Jersey, State v. DiPaolo, 1961, 34 N.J. 279, 168 A.2d 401, cert. denied 368 U.S. 880, 82 S.Ct. 130, 7 L.Ed.2d 80; New Mexico, State v. Upton, 1955, 60 N.M. 205, 290 P.2d 440; New York, § 30.05 Penal Law 1965; North Carolina, State v. Hairston, 1943, 222 N.C. 455, 23 S.E.2d 885; North Dakota, § 12-02-01 (4) N.D.Century Code 1960; Oklahoma, Gresham v. State, Okl.Cr. 1971, 489 P.2d 1355; Pennsylvania, Commonwealth v. Woodhouse, 1960, 401 Pa. 242, 164 A.2d 98; Rhode Island, State v. Page, 1968, 104 R.I. 323, 244 A.2d 258; South Carolina, State v. Thorne, 1961, 239 S.C. 164, 121 S.E.2d 623, cert. denied 368 U.S. 979, 82 S.Ct. 485, 7 L.Ed.2d 440; South Dakota, § 22-3-1(4), S.D.Compiled Laws 1967; Tennessee, Spurlock v. State, 1963, 212 Tenn. 132, 368 S.W.2d 299; Texas, Simpson v. State, 1956, 163 Tex.Cr.R. 385, 291 S.W.2d 341; Utah, State v. Holt, 1969, 22 Utah 2d 109, 449 P.2d 119; Virginia, Thompson v. Commonwealth, 1952, 193 Va. 704, 70 S.E.2d 284; Washington, State v. Reece, 1971, 79 Wash.2d 453, 486 P.2d 1088; West Virginia, State v. Painter, 1950, 135 W. Va. 106, 63 S.E.2d 86, and Wyoming, State v. Brown, 1944, 60 Wyo. 379, 151 P.2d 950.
[4] Maine, Title 15, § 102, Me.Rev.Stats. Annot.; New Hampshire, State v. Pike, supra.
[5] Connecticut, Vol. IX, § 53a-13, Gen. Stats. of Conn.; Idaho, State v. White, supra; Illinois, Ill. Rev. Stat. 1971, ch. 38, § 6-2(a), (b); Indiana, Hill v. State, 1969, 252 Ind. 601, 251 N.E.2d 429; Kentucky, Terry v. Commonwealth, Ky. 1963, 371 S.W.2d 862; Maryland, Art. 59, § 25, 5B, Annot.Code Md.; Massachusetts, Commonwealth v. McHoul, 1967, 352 Mass. 544, 226 N.E.2d 556; Missouri, § 552.030(1), Mo.Rev.Stats. 1969, V.A.M.S.; Montana, § 95-501, Rev. Codes of Mont. 1969; Ohio, State v. Staten, 1971, 25 Ohio St.2d 107, 267 N.E.2d 122; Vermont, 5 Vt.Stat.Annot. Title 13, § 4801, and Wisconsin, State v. Shoffner, 1966, 31 Wis.2d 412, 143 N.W.2d 458.
[6] United States v. Freeman, supra; United States v. Currens, 3rd Cir.1961, 290 F.2d 751; United States v. Chandler, 4th Cir.1968, 393 F.2d 920; Blake v. United States, 5th Cir.1969, 407 F.2d 908; United States v. Smith, 6th Cir.1968, 404 F.2d 720; United States v. Shapiro, 7th Cir.1967, 383 F.2d 680; Wade v. United States, 9th Cir.1970, 426 F.2d 64; Wion v. United States, 10th Cir.1963, 325 F.2d 420.
[7] Beltran v. United States, 1st Cir.1962, 302 F.2d 48; Pope v. United States, 8th Cir.1967, 372 F.2d 710.
[8] According to the testimony of one of the psychiatrists:

"[Anderson] said for the past two or three years he had heard voices talking to him constantly. They would call his name and would not let him sleep. As he said, and I quote, `They keep messing with me all the time.'
"He said the voices would tell him to kill himself, but did not instruct him as to how he was supposed to go about doing it. He said he conversed with God.
* * * * *
"He said a lot of people did not like him, which he expressed ideas of. He felt people would talk about him. They claimed he was crazy. He also describes his repetitive hallucinations by his dead father. He pointed out that he had attended school and got along well, and in the eleventh grade, at the time of his arrest, he said at times he would have to lie down because he would have dizzy spells and the voices would bother him."
The second psychiatrist, who treated Anderson while he was in the South Florida State Hospital, said the boy was placed under heavy medication while at the hospital and "his sanity is dependent upon the continued use of medication."
[1] "(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [or wrongfulness] of his conduct or to conform his conduct to the requirements of law.

"(2) The terms `mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." Model Penal Code § 4.01 (Tent.Draft No. 4, 1955).