116 So.2d 626 (1959)
Howard B. PICCOTT, Appellant,
v.
STATE of Florida, Appellee.
Supreme Court of Florida.
December 9, 1959.
Rehearing Denied January 12, 1960.
*627 Tobias Simon, Miami, for appellant.
Richard W. Ervin, Atty. Gen., and George R. Georgieff, Asst. Atty. Gen., for appellee.
O'CONNELL, Justice.
Appellant Piccott was indicted and tried for the rape of a nine year old girl. The jury returned a verdict of guilty without a recommendation to mercy. He appeals from the judgment of guilty and sentence to death which followed the jury's verdict.
Defendant does not contend that he did not commit the crime charged against him. In fact, in his own testimony at the trial he freely admitted commission of the rape. Nor does he contend that he did not know that his acts were wrong. Rather, by his own testimony and that of psychiatrists called by him, he sought to excuse his actions by showing that he suffered from a mental illness which rendered him incapable of overcoming the urge to touch and molest young girls.
Defendant's principal argument before us is directed to a plea that this Court should abandon the "right or wrong" test or the "Rule in M'Naghten's Case" in measuring responsibility of one for criminal acts where the defense of insanity is made, in favor of the "irresistible impulse" or "moral insanity" test adopted by the Supreme Court of New Hampshire in State v. Pike, 1870, 49 N.H. 399, and the similar rule adopted by the Circuit Court of Appeals for the District of Columbia in Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430.
Counsel for defendant has done an outstanding job of researching this question and in presenting his views, both in his brief and before this Court. Yet we have not been convinced that the M'Naghten rule is not the best available rule for measuring the mental condition of the individual in terms of accountability for criminal acts. We therefore adhere to the Rule in M'Naghten's case as do all other jurisdictions except the two above mentioned.
The defendant urges twelve other questions. We have carefully considered each and find no fundamental error in any of them. Except for one of them, a discussion thereof would add nothing to the jurisprudence of this State.
The one question which we feel merits discussion relates to the voir dire examination of prospective jurors.
On voir dire examination, the State challenged, and the court excused, several jurors for cause. Counsel for defendant made timely objection to the court's excusing nine of these jurors.
Each of the nine jurors, in different words, announced that he was opposed to taking life in punishment of crime. One qualified his position by saying that he believed in capital punishment where the accused had taken life, but for no other crime. All indicated that they could render a verdict of guilty in this case but that if they did so they would require a recommendation to mercy to prevent the life of the accused being taken.
As stated by this Court in Singer v. State, Fla. 1958, 109 So.2d 7, competency of a challenged juror is a question of mixed law and fact to be determined by the trial judge in his discretion and the decision of the trial judge will not be disturbed unless the error is manifest. Seldom, if ever, will excusal of a juror constitute reversible error for the parties are not entitled to have any particular jurors serve. They are entitled only to have qualified jurors. No complaint is made here that the jurors who served were not qualified.
*628 We find no error in the trial judge's excusing these prospective jurors, yet we can see some basis for the defendant's interpretation of the statute involved and his objections to the court's action in excusing the jurors for cause.
The statute, Sec. 932.20, F.S.A. provides that:
"No person whose opinions are such as to preclude him from finding any defendant guilty of an offense punishable with death shall be allowed to serve as a juror on the trial of any capital case."
Defendant interprets this statute to mean that a venireman meets its requirements if he asserts that he will, if the evidence warrants, return a verdict of guilty in a capital case. Defendant takes the position that it is immaterial whether the venireman also in effect stated that if he found the defendant guilty he would, because of a disbelief in capital punishment, couple the guilty verdict with a recommendation to mercy to avoid the taking of the defendant's life. This is so, says the defendant, because a juror has an unbridled right to recommend mercy, Pait v. State, Fla. 1959, 112 So.2d 380, and the fact that he determines to do so in advance of the evidence does not disqualify him since he is not limited to the evidence in determining whether he will or will not grant mercy.
We can not agree to the defendant's interpretation of the statute.
We think it clear that the statute must be construed to mean that only those persons who are not, by conscientious scruples, beliefs, convictions, or opinions, based on moral, religious, or other grounds, precluded from infliction of the death penalty as punishment for crime, shall be considered qualified to serve as jurors on trial of a capital crime.
This is so because under our statutes the jurors in a capital case have the power and duty not only to determine guilt, but also to determine absolutely whether the death penalty, or only imprisonment, shall be imposed as punishment.
It is therefore not enough that a juror be able fairly and impartially to determine guilt or innocence. It is equally essential that he be free of any preconceived opinions, beliefs, or convictions which will prevent or preclude his joining in a verdict which will take the life of the defendant, so that he is free to exercise his discretion to grant or withhold mercy on the basis of evidence submitted at the trial.
Certainly, it can not be said that one who is opposed to infliction of capital punishment to the extent that he will not join in a verdict which results therein is in condition to impartially and fairly determine, on the evidence, whether such punishment shall or shall not be inflicted on a defendant. It is not unlikely that such a juror would vote "not guilty" merely to avoid the death penalty, if six other jurors refused to join in a recommendation to mercy.
If, as in this case, a venireman says that he is opposed to infliction of capital punishment and because of such opinion, belief, or conviction he will join in a verdict of guilty only if accompanied by a recommendation to mercy, he is not qualified and should not be allowed to serve. Metzger v. State, 1881, 18 Fla. 481, 487.
In this connection defendant also contends that because those veniremen who said they would recommend mercy as a part of any guilty verdict were excused for cause the "* * * jurors become imbued with the impression that a mercy recommendation was in judicial disfavor."
In each case the nine veniremen excused were asked in varying words whether he had any conscientious scruples against capital punishment. The answers were not always so specific as to enable the State or the court to determine whether the venireman was or was not qualified. Consequently other questions followed which brought *629 answers which indicated that the venireman would join in a verdict of guilty only if it was qualified by a recommendation to mercy.
Viewing the whole of the questioning we find no error or prejudice to the defendant here. There was no impropriety in searching the minds of the veniremen in this fashion to ascertain their views on the infliction of the most extreme penalty allowed by law and their intended use of a recommendation to mercy to avoid such a penalty because of opposition to capital punishment. See United States v. Puff, 2 Cir., 1954, 211 F.2d 171, 48 A.L.R.2d 540, certiorari denied 347 U.S. 963, 74 S.Ct. 713, 98 L.Ed. 1106, rehearing denied 347 U.S. 1022, 74 S.Ct. 876, 98 L.Ed. 1142, and 348 U.S. 853, 75 S.Ct. 20, 99 L.Ed. 672. See also Hardy v. United States, 186 U.S. 224, 22 S.Ct. 889, 46 L.Ed. 1137, where it was held there was no impropriety in permitting the government to search the mind of the juror to ascertain if his views on circumstantial evidence were such as to preclude him from finding a verdict of guilty with the most extreme penalty which the law allows.
It may well be that voir dire questions and rulings by a court which would reasonably cause jurors to believe that their right to grant or withhold a recommendation to mercy on basis of the evidence was in any way circumscribed could possibly constitute prejudicial error in trial of a capital case but such is not the case here. The defendant does not complain that the jury was not properly charged as to their unfettered right to grant mercy on a basis of the evidence produced at the trial.
Every effort should be made to avoid entangling the question of whether or not a juror will or will not on the evidence grant mercy with the question of whether or not he is free of preconceived opinions, beliefs or convictions which would prevent his joining in a verdict which will result in effecting the death penalty.
Voir dire questions should be designed to determine that the venireman is capable of joining in a verdict which will result in taking the life of the accused if the evidence warrants, or, stated another way, that he is free of conscientious scruples, beliefs, convictions, or opinions which would preclude or prevent his joining in such a verdict, irrespective of the evidence.
It would seem proper to inject the question of mercy in voir dire examination only when the venireman indicates that he can and will determine guilt of a capital crime according to the evidence but will nevertheless, irrespective of the evidence, use the power to recommend mercy because of conscientious scruples, beliefs, convictions or opinions against taking life as punishment for crime.
The appellant has filed a well prepared appendix consisting of two hundred fifty pages representing a large amount of work on the part of his attorney. We take this occasion to point out, for the benefit of attorneys in such causes, that under the provisions of Sec. 924.32, F.S.A. we are required to and do read all of the evidence in the record in every case in which the death penalty has been imposed, therefore an appendix serves little, if any, purpose in saving the time of this Court. Fla.App. Rule 6.16(b), 31 F.S.A. recognizes this obligation of this Court in death penalty cases, irrespective of whether the sufficiency of the evidence is raised on appeal, and requires review of the evidence in other criminal cases where the sufficiency thereof is raised on appeal.
It is for these reasons that Fla. App. Rule 6.11(a) provides that an appendix, while permissible, is not required to be filed in appeal of a criminal case.
We have given our close attention to each of the errors claimed by defendant to have been made in the trial of this cause, and have found no error prejudicial to his rights. In compliance with Sec. 924.32, F.S.A. we have carefully read all of the evidence to determine whether or not the ends *630 of justice require a new trial and have determined that they do not.
Accordingly the judgment and sentence appealed from are affirmed.
THOMAS, C.J., and TERRELL and ROBERTS, JJ., concur.
HOBSON, J., dissents in part.
HOBSON, Justice (dissenting in part).
Although I am not so callous or blind to reality as to believe that the appellant herein should not be punished for the heinous crime which he admittedly committed, I am, nevertheless, impelled to dissent from the majority opinion insofar as it adheres without reservation to the rule in the M'Naghten case  the "right-wrong" test.
I think the majority has failed to consider thoroughly the modern trend of legal thought upon mental condition as a defense in a criminal action. I shall, therefore, review briefly the development of the law on this subject.
One of the earliest legal tests formulated to eliminate criminal responsibility by reason of insanity was the so-called "wild beast" test, i.e., that if an accused person "doth not know what he is doing, no more than * * * a wild beast" he might escape punishment, Rex v. Arnold, 16 Howell State Trials, 695, 764 (1724). The "right-wrong" test was formulated as early as 1760, in Earl Ferrer's Case, 19 Howell State Trials, 886, but received its classic statement in the celebrated M'Naghten Case, 10 Cl. & Fin. 200, 8 Eng.Rep. 718 (1843), wherein the House of Lords said:
"To render a person irresponsible for crime on account of unsoundness of mind, the unsoundness should, according to the law as it has long been understood and held, be such as rendered him incapable of knowing right from wrong." (8 Eng.Rep. at p. 721.)
In spite of the development of psychological and psychiatric science, the M'Naghten rule remains the law today in most jurisdictions, of which Florida is one. The repeated criticisms of the rule of leading doctors, judges and lawyers for many years[1] leave no doubt that it is an instance of cultural lag, a crude survival from earlier times, when used as the sole test of insanity in law. It has been said that "Judging the issue of insanity according to the right-wrong test exclusively is like saying as a matter of law that the only acceptable symptom in defining appendicitis is a pain in the abdomen and that no other diagnostic symptom is valid."[2]
As early as 1870, the Supreme Court of New Hampshire, in State v. Pike, 49 N.H. 399, renounced the M'Naghten rule and took the view that an accused is not criminally responsible if his unlawful act was the result of mental disease or mental defect. In discussing the unsatisfactory character of the M'Naghten rule, the court stated (49 N.H. at page 442):
"Whether it is a possible condition in nature, for a man knowing the wrongfulness of an act, to be rendered, by mental disease, incapable of choosing not to do it and of not doing it,  and whether a defendant, in a particular instance, has been thus incapacitated,  are obviously questions of fact. But, whether they are questions of fact or of law, when an expert testifies that there may be such a condition, *631 and that, upon personal examination, he thinks the defendant is, or was, in such a condition  that his disease has overcome, or suspended, or temporarily or permanently obliterated his capacity of choosing between a known right and a known wrong,  and the judge says that knowledge is the test of capacity, the judge flatly contradicts the expert. Either the expert testifies to law, or the judge testifies to fact. From this dilemma, the authorities afford no escape.
"The whole difficulty is, that courts have undertaken to declare that to be law which is a matter of fact."
I think that this observation is still true, and see no reason why the issue of sanity should not be resolved like any other question of fact. As Chief Judge Biggs of the Third Circuit stated in United States ex rel. Smith v. Baldi, 192 F.2d 540, 568:
"The law, when it requires the psychiatrist to state whether in his opinion the accused is capable of knowing right from wrong, compels the psychiatrist to test guilt or innocence by a concept which has almost no recognizable reality."
Although all agree that the M'Naghten rule is inadequate, the real problem has been the development of a plausible and acceptable substitute. Such a substitute was announced in the case of Durham v. United States, supra, 214 F.2d 862, 874, where, after a careful analysis of the entire subject, the court makes the following statement:
"The rule we now hold must be applied on the retrial of this case and in future cases is not unlike that followed by the New Hampshire court since 1870. It is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect. We use `disease' in the sense of a condition which is considered capable of either improving or deteriorating. We use `defect' in the sense of a condition which is not considered capable of either improving or deteriorating and which may be either congenital, or the result of injury, or the residual effect of a physical or mental disease.
"Whenever there is `some evidence' that the accused suffered from a diseased or defective mental condition at the time the unlawful act was committed, the trial court must provide the jury with guides for determining whether the accused can be held criminally responsible. We do not, and indeed could not, formulate an instruction which would be either appropriate or binding in all cases. But under the rule now announced, any instruction should in some way convey to the jury the sense and substance of the following: If you the jury believe beyond a reasonable doubt that the accused was not suffering from a diseased or defective mental condition at the time he committed the criminal act charged, you may find him guilty. If you believe he was suffering from a diseased or defective mental condition when he committed the act, but believe beyond a reasonable doubt that the act was not the product of such mental abnormality, you may find him guilty. Unless you believe beyond a reasonable doubt either that he was not suffering from a diseased or defective mental condition, or that the act was not the product of such abnormality, you must find the accused not guilty by reason of insanity. Thus your task would not be completed upon finding, if you did find, that the accused suffered from a mental disease or defect. He would still be responsible for his unlawful act if there was no causal connection between such mental abnormality and the act. These questions must be determined by you from the facts which you find to be fairly deducible from the testimony and the evidence in this case." (Footnotes omitted.)
*632 The view thus taken in the Durham case meets the main objection to the M'Naghten rule, i.e., the unrealistic focus upon a single symptom of insanity. When the Durham case was decided the position was taken in some contemporary newspaper comments that the new test of insanity might result in the release of offenders into the community. See note, The Durham Case: "Mental-Cause" as a Criminal Defense, 43 Geo.L.J. 58. But, as has been pointed out by former United States Solicitor General Sobeloff, under the District of Columbia statute an accused who is acquitted by reason of insanity may be committed to an institution for an indefinite period. From M'Naghten to Durham and Beyond, footnote 2, supra. In Florida the same is true. F.S. § 919.11, F.S.A. authorizes the court to commit an accused acquitted by the jury for the cause of insanity "if the discharge or going at large of such insane person shall be considered by the court manifestly dangerous to the peace and safety of the people * * *."
I am not now prepared to say finally and unequivocally that the "right-wrong" rule should be the sole test of insanity in law.
NOTES
[1] In Durham v. United States, 94 U.S.App. D.C. 228, 214 F.2d 862, 870-871, some of these comments are quoted, including a statement by Mr. Justice Cardozo: "Everyone concedes that the present [legal] definition of insanity has little relation to the truths of mental life." A detailed bibliography on the subject is given in the Durham case at footnote 25.
[2] "From M'Naghten to Durham and Beyond," address by Simon Sobeloff, Solicitor General of the United States, before the National Conference of Bar Councils, May 19, 1955, reprinted in 41 A.B.A.J. 793, September, 1955.