DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**LISA CAVANAUGH,** as the Personal Representative of the **ESTATE OF WILLIAM CAVANAUGH**, deceased,
Appellant,

v.

**STRYKER CORPORATION**, a foreign corporation, et al.,
Appellees.

No. 4D19-523

[October 7, 2020]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, St. Lucie County; George A. Shahood, Senior Judge, and William L. Roby, Judge; L.T. Case No. 562013CA001800 (ME).

Paul M. Silva and Peter J. Somera, Jr. of Somera & Silva, LLP, Boca Raton, Jack Scarola and Michael H. Kugler of Searcy Denney Scarola Barnhart & Shipley, P.A., West Palm Beach, and Andrew A. Harris and Adam Richardson of Burlington & Rockenbach, P.A., West Palm Beach, for appellant.

Hildy M. Saste, William P. Geraghty, Daniel B. Rogers and Jennifer M. McLoone of Shook, Hardy & Bacon, L.L.P., Miami, for appellee.

PER CURIAM.

The Plaintiff, Lisa Cavanaugh, as personal representative of the Estate of William Cavanaugh, appeals a final judgment entered upon a defense verdict in her wrongful death action against Stryker Corporation, a medical device manufacturer ("the manufacturer"). We affirm on all issues raised, addressing only a jury instruction dispute and a juror selection issue. On all other issues we affirm without discussion.

### *Background*

#### A. Evidence at Trial

In November 2012, Mr. Cavanaugh died while undergoing lung-removal surgery at Lawnwood Regional Medical Center ("the hospital"). The

surgical team included a surgeon with the assistance of a registered nurse ("the nurse").

The manufacturer's medical device, called the Neptune 2, was used throughout the procedure in order to remove blood and clear the surgical field. The Neptune 2 is a high-flow suction device "intended to collect and dispose of surgical fluid waste." The device is not intended to be connected or used during passive chest drainage.

During Mr. Cavanaugh's surgery, the Neptune 2 was connected to suction tubing, which had what is called a Yankauer suction tip attached to it. When the operation was almost finished, the surgeon inserted a chest tube into Mr. Cavanaugh's chest. The chest tube should have been connected to an Atrium or Pleur-evac, which are devices for passive chest drainage. Instead, the nurse either touched or connected the Yankauer suction tip (and therefore the Neptune 2) to the chest tube, causing Mr. Cavanaugh's heart to be "sucked . . . over to the other side" of his chest. Mr. Cavanaugh unfortunately died from the immediate and severe blood loss.

Both the surgeon and the nurse testified that they thought standard wall suction was being used for the chest drainage. They both added that they were not aware that the Neptune 2 device was being used. The Plaintiff brought this wrongful death action against various defendants, including the manufacturer. The Plaintiff's original complaint asserted medical malpractice claims against the hospital and the nurse, but those claims were settled. The claims in the complaint against the manufacturer were for strict liability based on design defects (Count I), strict liability based on failure to warn (Count II), and negligence (Count III).

The manufacturer answered and asserted various defenses, including (1) the learned-intermediary defense, (2) the intervening or superseding cause defense, and (3) a *Fabre*[1] defense.

At trial, the following evidence was presented about the Neptune 2 device. The Neptune 2 came on the market in 2007. The Neptune 2 had higher suction capabilities than its predecessor, the Neptune 1. Nevertheless, the manufacturer asserted that the Neptune 2 was covered by the clearance that it had obtained from the U.S. Food and Drug Administration ("FDA") to market the Neptune 1 device.

---

[1] *Fabre v. Marin*, 623 So. 2d 1182 (Fla. 1993).

In June 2012, the manufacturer sent an urgent medical device notification to its customers regarding the instructions for use on the Neptune 2. The Notification stated that "Stryker received one report of a [2010] fatality from a customer in which the Neptune [2] was connected to a passive chest drainage tube post-operatively," that the current instructions for use did "not specifically warn against connecting the Neptune [2], which is a high vacuum/high flow device, to a passive drainage tube," and that the instructions for use were being updated with a new warning.

In August 2012, the FDA notified the manufacturer that the Neptune 2 needed its own FDA clearance, as the FDA considered the Neptune 2 to be a potentially adulterated device. The FDA advised the manufacturer that the Neptune 2 "may not be used at this particular time," but created an exception whereby the device would be allowed to stay in medical use under a certificate of medical necessity.

The next month, Stryker issued a recall notice advising customers that they should no longer use the Neptune 2 unless they had no alternative device to use. The notice stated that, "if you do not have an alternative device to use, you should weigh the risk and benefits of using these devices and if you choose to continue using the either the Neptune Silver or the Neptune 2, you must complete the attached Certificate of Medical Necessity . . . ." An executive of the hospital's parent company signed a Certificate of Medical Necessity. This certificate was in effect at the time of Mr. Cavanaugh's surgery.

The warning label affixed to the Neptune 2 at the time of Mr. Cavanaugh's surgery stated: "DO NOT apply high flow suction in applications that may result in severe injury or death; for example, passive chest drainage," while still characterizing the device's suction capabilities as "LOW," "MEDIUM," and "HIGH."

The instructions for use provided a similar warning not to apply high flow suction during procedures such as passive chest drainage, adding that failure to comply may result in serious injury or death. Although the nurse testified that he never read the warnings or instructions for use concerning the Neptune 2, he generally knew that it was not appropriate to apply high suction to a closed drainage system.

The surgeon testified he did not know that the Neptune 2 was only a high-suction device. The surgeon explained that a device without low suction would be inappropriate to use during a lung-removal surgery. Had the surgeon known that the Neptune 2 device was not FDA-approved, or

that a previous patient had been severely injured by the device, he would not have allowed the Neptune 2 to be used during the surgery.

The Plaintiff presented expert testimony from a materials scientist, who opined that the Neptune 2 was defectively designed, unreasonably dangerous, and lacked proper warnings. The materials scientist testified that the user interface was confusing, which could result in the user applying "unsafe vacuum or inappropriate vacuum in the wrong application." The materials scientist also testified that the warning was confusing and failed to inform the user that, even at its lowest setting, the device should not be connected to a chest tube or closed-wound drain.

The Plaintiff also presented the testimony of a medical device engineer and a former medical officer in the FDA's Office of Compliance. Taken together, their testimony was that (1) the manufacturer should have sought clearance from the FDA before releasing the Neptune 2; (2) the manufacturer did not undertake a proper risk analysis when it determined that it was not required to obtain separate FDA clearance for it; and (3) the FDA communicated to the manufacturer that the Neptune 2 was an adulterated device which was marketed without FDA clearance.

The manufacturer's principal defense was that Mr. Cavanaugh's death was attributable to misuse of the Neptune 2 by medical staff, not design defect or insufficient warnings. It argued that the Neptune 2 is not intended to be used for passive chest tube drainage, as it is widely known in the medical profession that high suction should not be connected to chest tubes. The manufacturer also maintained that there were sufficient warnings to this effect accompanying the Neptune 2 at the time of Mr. Cavanaugh's surgery, and that three weeks before the surgery a representative of the manufacturer had provided in-service training for the hospital's operating room staff, wherein they were advised that the Neptune 2 should not be used for passive chest drainage because it could cause death. Nonetheless, the manufacturer asserts in its answer brief that the nurse "mistakenly connected the chest tube to the Yankauer suction tip [which had been connected to the Neptune 2]," which resulted in the death of Mr. Cavanaugh.

## B. Replacement of Juror

When the trial lasted longer than expected, the parties learned that scheduled jury deliberations might interfere with a juror's prepaid weekend vacation from Friday, June 1 to Sunday, June 3.

4

On Wednesday, May 30, the Plaintiff finished her rebuttal case. The next day, the trial court and defense counsel questioned the juror, who answered that staying to complete the deliberations "would be a little bit of a hardship," but that he "could do half a day" on Friday "if that would finish things up."

The Plaintiff moved to excuse the juror and "to seat the first alternate juror in [the juror's] place." The manufacturer objected, arguing that "there's no reason why if he needed to leave [on Friday] we couldn't bring the jury back on Monday to finish deliberations if that was necessary."

The trial court stated that it would "excuse [the juror] on its own for cause." The trial court inquired about who would replace the juror, and Plaintiff counsel responded: "Yes, we seat . . . the first alternate juror."

However, the trial court, sua sponte, made the following offer to the parties: "You know, I would allow an additional challenge if either one of you want one. I think that would be fair."

Defense counsel then exercised a peremptory strike on the first alternate juror. Plaintiff counsel immediately objected:

> PLAINTIFF COUNSEL: Your Honor, I know of no basis --
>
> THE COURT: There is no basis.
>
> PLAINTIFF COUNSEL: -- upon which to allow an additional challenge at this point.
>
> THE COURT: Well, these are unusual circumstances. I may be wrong, but I'm going to do it anyway.
>
> PLAINTIFF COUNSEL: Okay. Well, respectfully, sir, I don't think they're unusual at all. We lose jurors all the time. And the procedure when we lose a juror is we seat the next first alternate juror. And we don't give the defense the option of deciding which of the two alternate jurors they want, which is what effectively the court has done. So we do object. I don't think that it's proper.

The trial court "noted" the objection but seated the second alternate juror.

### C. Disputed Jury Instruction

5

Before the charge conference, the Plaintiff submitted a proposed design defect jury instruction that contained both the risk utility test and the consumer expectations test, respectively:

> A product is defective because of a design defect if it is in a condition unreasonably dangerous to the user or a person in the vicinity of the product and the product is expected to and does reach the user without substantial change affecting that condition.
>
> A product is unreasonably dangerous because of its design if the product fails to perform as safely as an ordinary consumer would expect when used as intended or when used in a manner reasonably foreseeable by the manufacturer or the risk of danger in the design outweighs the benefit.

The Plaintiff's proposed jury instruction was taken directly from the standard instruction in effect at the time. *See* Fla. Std. Jury Instr. (Civil) 403.7(b) (2015).[2]

By contrast, the manufacturer's proposed jury instruction on design defect contained only the risk utility test (the first paragraph of Standard Jury Instruction 403.7(b)) and a portion of the consumer expectations test ("A product is unreasonably dangerous if the risk of danger in the design outweighs the benefit.").

At the charge conference, the Plaintiff's counsel advised the trial court that the parties had a disagreement on the design defect instruction. The trial court ruled that it would give the manufacturer's instruction instead of the Plaintiff's instruction. The Plaintiff did not object when the trial court accepted the manufacturer's defense instruction on 403.7(b).[3] This ruling is challenged by the Plaintiff on appeal.

**D. The Jury Verdict**

---

[2] Standard Jury Instruction 403.7 was amended by the Florida Supreme Court in February 2020. *In re Standard Jury Instructions in Civil Cases—Report No. 19-03*, 290 So. 3d 840, 842 (Fla. 2020).

[3] We conclude that this issue is preserved because the Plaintiff submitted a proposed jury instruction containing the consumer expectations test, and the trial court rejected it by adopting the manufacturer's proposed instruction instead. *See Middelveen v. Sibson Realty, Inc.*, 417 So. 2d 275, 277 (Fla. 5th DCA 1982) ("[I]f a party submits a written request for a jury instruction, and it is rejected by the trial court, the issue is preserved for appellate review without more.").

After a four-week trial, the reconstituted jury returned a defense verdict. The jury rejected the Plaintiff's claims for defective design, defective warnings, negligent design, and negligent warnings. The trial judge entered a final judgment in the manufacturer's favor, and a successor judge denied the Plaintiff's motion for new trial. This appeal ensued.

## *Analysis*

### A. *The Trial Court Did Not Err in Refusing to Instruct the Jury on the Consumer Expectations Test*

On appeal, the Plaintiff argues that the trial court was required to instruct the jury on the consumer expectations test under the Florida Supreme Court's decision in *Aubin v. Union Carbide Corp.,* 177 So. 3d 489 (Fla. 2015). The Plaintiff contends that the instruction was an accurate statement of the law, was supported by the evidence, and was necessary to allow the jury to properly resolve all the issues in the case.

In *Aubin,* the Florida Supreme Court declared that "in approaching design defect claims, we adhere to the consumer expectations test, as set forth in the Second Restatement [of Torts], and reject the categorical adoption of the Third Restatement and its reasonable alternative design requirement." *Id.* at 510. Thus, the supreme court held that "the Third District erred in determining that the Third Restatement's test for a defective design exclusively applied to a claim of strict products liability, which generally requires plaintiffs to establish a reasonable alternative of how a product could be designed." *Id.* at 519–20.

The supreme court explained that "[t]he critical difference regarding design defects between the Second Restatement and the Third Restatement is that the Third Restatement not only replaces the consumer expectations test with the risk utility test, but also requires the plaintiff to demonstrate the existence of a reasonable alternative design." *Id.* at 505 (citation and internal quotation marks omitted).

"Under the consumer expectations test, a product is considered to be defective 'where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to [the consumer].'" *Id.* at 513 (quoting Restatement (Second) of Torts § 402A cmt. g. (1965)). The consumer expectations test "considers whether a product is unreasonably dangerous in design because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable

7

manner." *Id.* at 503. "This test intrinsically recognizes that a manufacturer plays a central role in establishing the consumers' expectations for a particular product, which in turn motivates consumers to purchase the product." *Id.*

While the supreme court concluded that "the Third Restatement's risk utility test and establishment of a reasonable alternative design mandate are not requirements for finding strict liability," the court explained that nothing precludes the parties from presenting evidence concerning whether "a reasonable alternative design existed" and "whether the benefit of the product's design outweighed any risks of injury or death caused by the design." *Id.* at 511–12.

We conclude *Aubin* is distinguishable from the instant case. *Aubin* involved asbestos, which is not a complex product. Notably, *Aubin* did not express disagreement with or disapproval of cases recognizing that some products may be too complex for a logical application of the consumer expectations test. *See, e.g., Force v. Ford Motor Co.*, 879 So. 2d 103, 109–10 (Fla. 5th DCA 2004) (concluding that while "there may indeed be products that are too complex for a logical application of the consumer-expectation standard[,]" the consumer expectation standard nonetheless applied to seat belts, which were "on the cusp" of being "too complex for an ordinary consumer to have any expectations concerning their proper operation"); *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1339 (M.D. Fla. 2015) ("Because this case pertains to a complex medical device, accessible to the consumer only through a physician, the Court finds that the consumer-expectation test is not applicable here."); *Rydzewski v. DePuy Orthopaedics, Inc.*, 11-80007-CIV, 2012 WL 7997961, at *3 (S.D. Fla. Aug. 14, 2012) (concluding that consumer expectation theory did not apply to a hip implant device, which was "closer to prescription drugs than to seatbelts and other products routinely operated by consumers"); *In re Fosamax Products Liab. Litig.*, 742 F. Supp. 2d 460, 470 n.4 (S.D.N.Y. 2010) (applying Florida law and concluding that "prescription pharmaceuticals are too complex for the straight-forward application of the consumer expectation test").

We read *Aubin* as establishing that a plaintiff may elect to prove a design defect claim under the consumer expectations test in any case where an ordinary consumer could form expectations about the product at issue. But *Aubin* did not decide whether the consumer expectations test can logically be applied to a complex medical device accessible to the consumer only through a medical professional. That is the issue we must decide in this case.

8

Turning to the case before us, we hold that the consumer expectations test cannot be logically applied here, where the product in question is a complex medical device available to an ordinary consumer only as an incident to a medical procedure.[4] After all, medical device manufacturers generally do not market their products to "ordinary consumers." Indeed, in this case, the Neptune 2 was never marketed to ordinary consumers. Ordinary consumers would not be purchasing the Neptune 2 and would not have formed expectations regarding the product. The rationale for the consumer expectations test—that a manufacturer plays a central role in establishing the consumers' expectations for a particular product, which in turn motivates consumers to purchase the product—simply does not apply to the Neptune 2 device.

Even assuming that some version of the consumer expectations test should apply to complex medical products which are provided to a consumer through a learned intermediary, the standard instruction would need to be modified in order to inform the jury that the relevant expectations are those of the health care professional. *See Porter v. Rosenberg*, 650 So. 2d 79, 82 (Fla. 4th DCA 1995) ("In many cases the health care provider is in fact more akin to the consumer or user of the product, especially where the product is not transferred to the patient but utilized incidental to the provision of medical services."); *see also Moss v. Wyeth Inc.*, 872 F. Supp. 2d 162, 170–71 (D. Conn. 2012) ("Under the learned intermediary doctrine, however, the relevant expectations are those of the *physician*, not the ultimate consumer."). The Plaintiff's proposed instruction as written would have been misleading to the jury because it failed to inform the jury that the relevant expectations are those of the medical professional, not the ordinary consumer.

Accordingly, we conclude that the Plaintiff's proposed instruction was not an accurate statement of the law under the specific facts of the case and would have been confusing to the jury. We therefore find no abuse of discretion in the trial court's decision to withhold the instruction.

---

[4] We do not hold that complexity alone is necessarily enough to preclude the application of the consumer expectations test. Indeed, "[m]any familiar consumer products involve complex technology." *Cunningham v. Mitsubishi Motors Corp.*, C-3-88-582, 1993 WL 1367436, at *4 (S.D. Ohio June 16, 1993). The applicability of the consumer expectations test "does not depend necessarily on a product's complexity in technology or use[,]" but rather depends on whether "prolonged use, knowledge, or familiarity of the product's performance by consumers is sufficient to allow consumers to form reasonable expectations of the product's safety." *Jackson v. Gen. Motors Corp.*, 60 S.W.3d 800, 806 (Tenn. 2001).

## B. The Trial Court's Error in Granting the Manufacturer an Additional Peremptory Strike was Harmless

As discussed above, near the completion of the trial, it was determined that one of the jurors had a conflict that necessitated that he miss a weekend of jury deliberations. Rather than take a weekend recess to accommodate this juror, the trial court granted the Plaintiff's motion to excuse the juror and replace him with one of the two alternate jurors. Instead of seating the first alternate, the trial court gave each party an opportunity to exercise a peremptory strike of that individual from the jury, necessitating the seating of the only other alternate juror when the manufacturer exercised this special peremptory.

On appeal, the Plaintiff argues that the trial court's providing (and granting) the peremptory strike of the first alternate was improper for two reasons: (1) parties cannot exercise peremptory challenges after the jury is sworn, and (2) the procedure violated Florida Rule of Civil Procedure 1.431(g), which mandates that alternate jurors must replace jurors in the order in which they are called. We agree with the Plaintiff that the trial court's offer of the extra juror challenge was improper, but we conclude that any error was harmless. *See Special v. W. Boca Med. Ctr.*, 160 So. 3d 1251, 1255 (Fla. 2014) (noting that the harmless error rule with respect to civil cases is rooted in section 59.041, Florida Statutes (2003), which focuses on whether "the error complained of has resulted in a miscarriage of justice").

We acknowledge that a trial court has broad discretion in jury selection matters. *Rock v. State*, 638 So. 2d 933, 934 (Fla. 1994). This includes the discretion to grant additional peremptory challenges. *Hooper v. State*, 476 So. 2d 1253, 1256 (Fla. 1985). However, Florida Rule of Civil Procedure 1.431(f) states that "[n]o one shall be sworn as a juror until the jury has been accepted by the parties or *until all challenges have been exhausted.*" Fla. R. Civ. P. 1.431(f) (emphasis added). Thus, "a juror may be peremptorily challenged *only* until he is sworn." *Tedder v. Video Elecs., Inc.*, 491 So. 2d 533, 534 (Fla. 1986).

Under rule 1.431(f)'s plain language, the jury may not be sworn until the jury has been accepted by the parties or until all challenges have been exhausted. It therefore follows that all peremptory challenges must necessarily occur before the jury is sworn, including peremptory challenges "in the selection of the alternate juror or jurors." Fla. R. Civ. P. 1.431(g)(2). Contrary to the manufacturer's argument that the rule "was not enacted to address the rare situation here," rule 1.431(f) prevents a party from exercising a peremptory challenge after the jury has been

sworn.  By requiring the parties to either accept the jury or exhaust all challenges prior to the jury being sworn, the rule implicitly prohibits peremptory challenges from being made after that.

This was not a "rare" or "extraordinary" circumstance.  Florida Rule of Civil Procedure 1.431(g)(1) addresses this exact circumstance, and states: "Alternate jurors *in the order in which they are called* must replace jurors who have become unable or disqualified to perform their duties before the jury retires to consider its verdict."  Fla. R. Civ. P. 1.431(g)(1) (emphasis added).  Thus, when the trial court excused the seated juror, it was required to replace him with the first alternate juror.[5]

Accordingly, the trial court erroneously granted the manufacturer an additional peremptory challenge long after the jury had been sworn, thereby allowing the manufacturer to strike the first alternate juror and replace the seated juror with the second alternate juror in violation of rule 1.431(g)(1).

We now turn to the question of whether the error was harmless.

"Seldom, if ever, will excusal of a juror constitute reversible error. . . ." *Piccott v. State*, 116 So. 2d 626, 627 (Fla. 1959).  This is because "the parties are not entitled to have any particular jurors serve."  *Id.*  Instead, "[t]hey are entitled only to have qualified jurors."  *Id.*; *see also West v. State*, 584 So. 2d 1044, 1045 (Fla. 1st DCA 1991) ("It is [] without dispute that a defendant's right to an impartial jury . . . does not entitle that defendant to be tried by any particular jurors or by a jury of a particular composition.").

There are numerous cases in which it was found that any error in removing a juror is harmless where the juror was replaced by a duly selected alternate who had been present during the entire proceedings and where no prejudice was shown to have resulted from the substitution.  *See, e.g., Ortiz v. State*, 835 So. 2d 1250, 1251 (Fla. 4th DCA 2003); *Graham v.*

---

[5] *Malota v. State*, 336 So. 2d 1267 (Fla. 4th DCA 1976), cited by the manufacturer, is distinguishable.  In *Malota*, this court held that the defendant had not shown prejudice where, after the jury was sworn but before opening statements, the trial court excused a juror who could not participate due to a sudden death in the family, reopened jury selection, and awarded each side more peremptory strikes. *Id.* at 1268.  However, the procedure in *Malota* is specifically authorized by Florida Rule of Criminal Procedure 3.310, which permits a juror to be removed for good cause after the juror is sworn *but before any evidence is presented*.  Fla. R. Crim. P. 3.310 (emphasis added).  In the instant case, the juror was excused at the conclusion of the trial, *after* all of the evidence had been presented.

11

*State*, 470 So. 2d 97, 98 (Fla. 1st DCA 1985); *Orosz v. State*, 389 So. 2d 1199, 1200 (Fla. 1st DCA 1980); *see also Porter v. State*, 388 So. 2d 18, 18–19 (Fla. 4th DCA 1980) (holding that the trial court's removal of a juror who had recognized a witness, even though the juror stated that she could fairly judge his testimony, was not prejudicial error where "an alternate juror was present to whom appellant had not objected").

This is not a case in which the first alternate was removed in favor of the second alternate due to "tactical gamesmanship" on the part of the manufacturer. *Cf. McNeil v. State*, 158 So. 3d 626, 628 (Fla. 5th DCA 2014). It was the Plaintiff that initiated the removal of one of the jurors rather than take a weekend recess, and it was the trial court that sua sponte provided both of the parties with a peremptory challenge to the first alternate juror.

Nor, as argued by the dissent, was there any "miscarriage of justice." Although it was error for the trial court to provide the parties with a peremptory challenge after both a jury and two alternates had been sworn and evidence had been presented, the error was not harmful error requiring a new trial, as there was no "tactical gamesmanship" on the part of the manufacturer and the first alternate was replaced by the second alternate, who had also been duly-selected prior to trial. Like the first alternate, the second alternate/replacement juror had been present for the duration of the trial. "[T]he parties are not entitled to have any particular jurors serve. . . . They are entitled only to have qualified jurors." *Piccott v. State*, 116 So. 2d 626, 627 (Fla. 1959).

### Conclusion

Mr. Cavanaugh's death was tragic. On that, there is no disagreement. A duly selected jury (including one alternate) determined that the Neptune 2 may have been misused, but that any liability for Mr. Cavanaugh's death was not attributable to design defect on the part of the Neptune 2's manufacturer. We find no reversible error with respect to the trial court's decision to not instruct the jury on the consumer expectations test, nor on any other issue raised by the Plaintiff on appeal. That includes the juror replacement issue, wherein we find error that is harmless and does not require a new trial.

*Affirmed.*

DAMOORGIAN and FORST, JJ., concur.

ARTAU, J., concurs in part and dissents in part with an opinion.

12

ARTAU, J., concurring in part and dissenting in part.

I agree that the complexity of the Neptune 2, coupled with the ordinary consumer's lack of access and familiarity with the product, precludes application of the consumer expectation test.

Notably, *Aubin v. Union Carbide Corp.*, 177 So. 3d 489 (Fla. 2015), did not categorically disapprove of the risk-benefit test. In fact, the Florida Supreme Court did not direct any modifications to the standard jury instructions, which "use both the consumer expectations test and risk utility test as alternative definitions of design defect." *Id.* at 512. Moreover, our supreme court recently amended Florida Standard Jury Instruction (Civil) 403.7(b) "to delete '[and]' between the consumer expectations and risk/benefit tests to reflect that a plaintiff may choose to prove a product's defectiveness through the risk/benefit test but is not required to do so pursuant to our decision in *Aubin v. Union Carbide Corp.*, 177 So. 3d 489 (Fla. 2015)." *In re Standard Jury Instructions in Civil Cases—Report No. 19-03*, 290 So. 3d 840, 840 (Fla. 2020). Thus, *Aubin* did not hold that the consumer expectations test is the exclusive test for design defect claims.

Unlike the majority, however, I do not find it harmless to grant the manufacturer a peremptory strike just before closing arguments. In *McNeil v. State*, 158 So. 3d 626 (Fla. 5th DCA 2014), our sister court correctly concluded that it was harmful error to allow a party to use a peremptory strike over the opposing party's objection after the trial had begun. *Id.* at 628. The Fifth District recognized: "Allowing the exercise of peremptory challenges to continue into the trial would encourage tactical gamesmanship, a result that we are unwilling to condone and one for which we feel compelled to provide a remedy." *Id.* at 628–29. Because a juror's questions may reveal a juror's impression of the evidence that has already been presented, the concern over "tactical gamesmanship" is even greater when jurors have been permitted to ask questions. *See* Fla. R. Civ. P. 1.452 (establishing procedure for questions by jurors in civil cases).

The trial court here allowed the manufacturer to exercise a peremptory strike after the manufacturer had the distinct advantage of hearing juror questions and viewing their reactions to the answers to those questions. By allowing the manufacturer to exercise this peremptory strike at the conclusion of the trial on the juror who had been lawfully selected before trial to serve as the first alternate juror to be seated, the trial court committed harmful error. *See Washington v. State*, 955 So. 2d 1165, 1173 (Fla. 1st DCA 2007) (holding that the excusal of a juror for asking "too

13

many questions" was not harmless, because "the reconfiguration of the jury panel is the very error that must be corrected").

Although the trial court believed its offer of an additional strike would be fair, the fairness of the court's offer was illusory. By eagerly accepting the erroneous offer, the manufacturer was able to gain a distinct tactical advantage. The manufacturer was able to use an additional peremptory strike with the benefit of knowing what evidence had been presented to the jury, and how the jurors had reacted to that evidence. By doing so, the manufacturer unilaterally took advantage of the trial court's error to tactically reconfigure the jury in a manner that it felt would boost its probability of a favorable verdict, leaving the Plaintiff unable to exercise an equivalent peremptory challenge, or otherwise have any say in configuring the new jury. Perhaps it is aspirational to have expected the manufacturer to "look the gift horse in the mouth,"[6] and reject the court's gratuitous offer. But the circumstances here are much more egregious than in *McNeil* where a peremptory strike was erroneously granted mid-trial to arguably address legitimate concerns that the juror there would not be "fair and impartial." 158 So. 3d at 627. Despite those legitimate concerns, *McNeil* concluded that a new trial was required to discourage "tactical gamesmanship." *Id.* at 628–29. No less is required here.

Under the circumstances, the manufacturer cannot meet its burden of proving that there was no reasonable possibility this error contributed to the verdict, or that the error did not result in a miscarriage of justice. *See Special v. W. Boca Med. Ctr.*, 160 So. 3d 1251, 1257 (Fla. 2014) (establishing test for harmless error in civil appeals, and concluding that "[a]n appellate court's harmless error analysis is not limited to the result in a given case, but it necessarily concerns the process of arriving at that result"); *see also* § 59.041, Fla. Stat. (2017) (the codified harmless error rule allows reversal and the granting of a new trial in the event of "a miscarriage of justice."). As in *Washington*, the improper reconfiguration of the jury panel is the very error and miscarriage of justice that must be corrected.

---

[6] This is an ancient proverb utilized to express the point that one would be ungrateful to question the value of a gift. Although its precise origin is unknown, it refers to the ancient practice of evaluating the age of a horse by looking at its teeth to determine its value. Obviously, if the horse was a gift, it would be rude to examine its mouth in front of the person who gifted it, as if one were trying to question the value of the gifted horse. But adherence to the law requires much more than common courtesy in accepting a gift. Here, it required the manufacturer to reject the court's gratuitous offer.

In sum, while I concur with the majority's finding that the trial court did not abuse its discretion in withholding the inapplicable consumer expectations instruction, I respectfully dissent as to their finding of harmless error in allowing the manufacturer to exercise a peremptory strike at the conclusion of the trial. Undoubtedly, the error in allowing one party to reconfigure the jury panel over the opposing party's objection was prejudicial and harmful here. Accordingly, I would reverse and remand for a new trial.

\* \* \*

**_Not final until disposition of timely filed motion for rehearing._**