IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 2, 2021 Session

**STATE OF TENNESSEE v. KEVION MCDONALD**

**Appeal from the Criminal Court for Shelby County**
**Nos. 19-01855, C1902568   James M. Lammey, Judge**
_____

**No. W2020-00127-CCA-R3-CD**
_____

Kevion McDonald, Defendant, was indicted by the Shelby County Grand Jury for one count of attempted first degree murder resulting in serious bodily injury and one count of employing a firearm during the commission of a dangerous felony.  After a jury trial, Defendant was convicted of both counts as charged in the indictment.  The trial court sentenced Defendant to an effective sentence of thirty-one years.  The trial court denied a motion for new trial.  Defendant initiated this appeal, arguing that the trial court: (1) improperly admitted a photographic lineup into evidence; (2) committed plain error by failing to instruct the jury on the definition of premeditation; and (3) improperly sentenced Defendant to twenty-five years in incarceration for attempted first degree murder resulting in serious bodily injury.  Defendant also challenges the sufficiency of the convicting evidence at trial.  After a thorough review of the record, we determine that the trial court erred by failing to instruct the jury with the definition of premeditation, an element of the offense of attempted first degree murder.  However, we find the error harmless because the proof of premeditation was overwhelming.  As a result, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and J. ROSS DYER, JJ., joined.

Brett B. Stein and Robert Golder (at trial), and Lance Chism (on appeal), Memphis, Tennessee, for the appellant, Kevion McDonald.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Wierich, District Attorney General; and Justin Prescott and Shelby Patrick, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Defendant was indicted by a Shelby County Grand Jury in March of 2019 for attempted first degree murder and employing a firearm during a dangerous felony. The initial indictment named Deleon Morehead as the victim. In August of 2019, the trial court granted an oral motion to amend the indictment, changing the victim to Carlos Smith. Defendant did not object to the amendment and does not raise any issue with regard to the validity of the indictment on appeal.

At trial, the victim testified that Defendant worked for him, remodeling houses and apartment complexes. Defendant had worked for the victim for about three months prior to the incident. They were "fairly close" as friends. The victim even called Defendant his "[G]odson."

The day before the incident, Defendant and the victim worked together all day before picking up their paychecks. The victim gave Defendant a ride to cash his check. The victim made a deposit while he was at the bank.

Later that night, around 11:00 p.m. or 12:00 a.m., Defendant came by the victim's house. According to the victim, Defendant was accompanied by two other men. The victim had never met these men before. The three men, including Defendant, came into the victim's house and stayed "[f]or a couple of hours," smoking marijuana. The victim explained that Defendant left the house at one point to go buy cigarettes at the store. The other two men stayed with the victim. While Defendant was gone, they discussed work and asked the victim what he was going to be doing the next day.

Defendant eventually returned to the victim's house, and the men resumed their conversation "about what [they] were going to do the next day at work." The victim explained that they were "just talking" and he "got up to go to the door" when Defendant "pulled out a gun" and asked him "bitch, where the shit at?" The victim thought Defendant was robbing him. The victim "flinched" and "leaned toward [the gun and] held [his] hand out." Defendant shot the victim twice in the right hand. The victim instinctively bent down and held his injured hand. Defendant then shot him in the right side at the head and again in the right leg. The victim fell to the floor and began to pray. The victim saw the men get up and head out the door before Defendant "turned back around, and he fired a couple of more shots." The victim thought that he was hit by the shots but did not know where on his body he was hit.

When Defendant and the other men left, the victim tried to get up. He attempted to open the door with his injured hand but the hand "just went backwards" and he was unable

- 2 -

to turn the doorknob. The victim explained that he prayed, asking God to save him. The victim eventually was able to open the door with his feet. Once the door was open, he was able to walk to his neighbor's house. He kicked on the door and asked for help.

The neighbor came to the door and the victim explained that he had been shot. The neighbor ran to get her husband. The victim asked the neighbor to pray with him. As they prayed, a car pulled up in the driveway. Defendant recognized it as the car Defendant "used to drive all the time." Someone got out of the car, approached the victim, and asked him if he was ok. The victim told the man who got out of the car that an ambulance was coming. The victim looked up and saw Defendant getting out of the car. Defendant "fired two more shots," from the driveway, about 70 or 80 feet away, again striking the victim in the head.

The next thing the victim recalled was waking up in the hospital. His right hand had been amputated, and his left side was paralyzed as a result of the injuries he received from the gunshots. Additionally, he had a "substantial scar" on his head. The victim spoke with police two times while he was in the hospital. The first time the victim spoke with police, he told them that Defendant was the person who shot him. The second time, the police officer brought a recorder and a photographic lineup. The victim explained that there were pictures of a "bunch" of people and he thought Defendant was "number three." During his testimony, the victim was shown a copy of a photographic lineup and he confirmed that it was the same lineup he was shown at the hospital. However, the victim admitted that the handwriting on the photograph did not belong to him because he was unable to write.

Deleon Morehead was the victim's neighbor on Meadow Valley Drive East. He recalled the incident, explaining that he heard a knock on his door and a voice asking for help at around 2:30 or 3:00 a.m. on October 4, 2017. He saw "a man standing there saturated in blood." Though Mr. Morehead did not recognize the victim, his fiancée recognized the injured man and called 911. Mr. Morehead told the victim to "hang tight" and closed the door slightly while he went back into the house to go to the bathroom. When he stepped away from the door, he heard a "pop" that "sounded like a gunshot." Mr. Morehead's fiancée called 911 for a second time. When the police arrived, the victim was lying on the ground praying.

Officer Lacquitta Armstrong of the Memphis Police Department was the first officer on the scene on October 4, 2017. The officer located the victim on the front porch of Deleon Morehead. She asked the victim who was responsible for his injuries. She explained that it was difficult to understand the victim "[b]ecause he had been shot" but that he said, "Kevon, Kevion or something like that." Officer Armstrong stated that the victim's "thumb was shot off," his "face was shot," and "his guts and everything was on

the . . . front door." The encounter was captured on Officer Armstrong's body camera and a portion of the footage was replayed for the jury. In the recording, the victim appears conscious and can be heard moaning and speaking to the officer. The victim is able to identify himself and also identifies Defendant by first name as the shooter.

Officer Derek Blake also responded to the scene. He went into the victim's house where he saw "blood inside the doorway." The house was full of smoke and three shell casings were recovered from inside the house. The three shell casings were identified as ".380 auto casings" by Officer Marcus Mosby of the Crime Scene Investigation Unit. Officer Blake also saw blood on the porch of the neighbor's house across the street.

During the investigation of the shooting, Lieutenant Derrick Williams received information that led him to begin searching for a person named Kevon or Kevin. At that time, the victim was in "extremely critical condition" and unable to speak to officers. The victim's family, however, was able to tell officers that the victim had a friend named "Kevion." Even with the name, officers were initially unable to come up with an identity. Once the victim was awake and conscious, approximately thirty-nine to forty days after the incident, he was able to identify Defendant as the shooter.

Lieutenant Williams found a photograph of Defendant and prepared a photographic lineup including that photograph. When the photographic lineup was prepared, the victim was in "isolation" in the ICU at Regional One hospital. Lieutenant Williams explained that he had to "put on [a] fire hazard gown, mask, [and] gloves" before entering the victim's room and had to "discard" anything that was taken into the room. Lieutenant Williams "made two photo spreads" that were identical and "asked the nurse" to "stand at the door and listen to what the victim would say while [the officer] went in to the room and showed [the victim] the spread, because the photo spread . . . would have to be discarded" when the officer left the room. Additionally, the victim was not able to write on the spread "due to his injuries." Lieutenant Williams identified the photo spread and the nurse's handwriting. Counsel for Defendant objected to its admission based on "chain of custody." The trial court overruled the objection and the photographic lineup was admitted into evidence. Lieutenant Williams confirmed that when he showed the lineup to the victim, the victim identified photograph number three as Defendant.

Defendant testified that he was 23 years of age at the time of trial. At the time of the incident, he was 20 years old. He worked with the victim at Cambridge Station doing maintenance work. Melody Jaramillo was the manager of the apartments. The victim and Defendant had worked together for about three months. Defendant called the victim "[P]ops" and the victim called him "Godson." They were fairly close, and went out to eat at Denny's and IHOP on occasion. Defendant got off work around 4:00 p.m. on the day prior to the incident and went to the victim's house for about an hour. From there,

Defendant went to a few other places, including the home of Ms. Jaramillo, where he hung out with her son. Eventually, Defendant ended up back at the victim's house at around "12, 12:10ish" in the morning. Defendant texted the victim to let him know he was outside. According to Defendant, the victim met him outside because he "had company." Defendant and the victim sat in the car and "[s]moked marijuana and cigarettes" and drank for "about 45 minutes" before Defendant left around 12:40-12:45 a.m. Defendant went home.

The next morning, Defendant did not hear from the victim. He thought this was strange because the victim was his "ride" to work and it was strange that he did not call or show up "without an explanation." Ms. Jaramillo showed up at his house around 10:00 a.m. She told Defendant that the victim had been shot and asked him if he was going to work. Defendant did not want to go to work after he found out that the victim had been shot.

Defendant was contacted by the victim's relatives after the incident. He "answered all the questions that they asked [him]" about the victim.

Defendant's mother, Demetria Scurlock, testified that Defendant lived with her. Defendant came home after work on the night prior to the incident but she did not know what he did the remainder of the evening after she went to bed around 10:00 p.m. Ms. Scurlock got up at around 5:30 a.m. the next morning. When she got up in the morning, the house was quiet and Defendant was asleep in his bedroom.

At the conclusion of the trial, the jury found Defendant guilty of attempted first degree murder resulting in serious bodily injury and employing a firearm during the commission of a dangerous felony. After a sentencing hearing, the trial court sentenced Defendant to twenty-five years for attempted first degree murder resulting in serious bodily injury and six years for employing a firearm during the commission of a dangerous felony. The trial court ordered the sentences to be served consecutively, for a total effective sentence of thirty-one years.

Defendant filed a motion for new trial and supplemental motion for new trial in which he challenged the sufficiency of the evidence, the admission of the photographic lineup, his sentence, and the denial of his pretrial motions. The trial court denied the motion for new trial and this appeal followed.

*Analysis*

*Jury Instructions*

Defendant argues that the trial court erred by failing to define premeditation during the jury instructions on attempted first degree murder. Defendant admits that trial counsel failed to object to the instructions at trial and failed to raise the issue in a motion for new trial. However, Defendant submits that the trial court's failure to properly instruct the jury is "plain error" because the trial court failed to instruct the jury on an element of the offense. The State, on the other hand, argues that there was no clear and unequivocal rule of law breached because there are no statutes or cases in Tennessee considering whether the failure of a trial court to specifically define premeditation during the jury instructions constitute reversible error.

Defendant does not dispute that he failed to object to the jury instructions at trial. Moreover, Defendant acknowledges that he failed to raise the jury instruction issue in his motion for new trial. *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . jury instructions granted or refused . . . unless the same was specifically stated in a motion for a new trial[.]"); *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (holding that failure to object to erroneous definitions of intentionally and knowingly did not waive error but failure to include issue in motion for new trial did).

Tennessee Rule of Appellate Procedure 36(b) states: "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Because Defendant failed to object at trial and failed to include the issue in his motion for new trial, we are limited to reviewing the issue for plain error. *See* Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."); *Faulkner*, 154 S.W.3d at 58. Issues not raised in the trial court may be reviewed in the discretion of the appellate court for plain error when these five factors are established: (a) the record clearly establishes what occurred in the trial court; (b) a clear and unequivocal rule of law was breached; (c) a substantial right of the accused was adversely affected; (d) the defendant did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice. *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016); *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000).

The record is clear what happened in the trial court. The trial court instructed the jury that Defendant was charged with attempted first degree murder resulting in serious bodily injury. The instruction given was as follows:

> Any person who attempts to commit [f]irst [d]egree [m]urder where the victim suffers serious bodily injury is guilty of a crime.

For you to find a person guilty of this offense, the [S]tate must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) That the defendant intended to commit [f]irst [d]egree [m]urder; and
(2) That the defendant did some act intending to cause an essential element of [f]irst [d]egree [m]urder to occur, and at the same time believed the act would cause the element to occur without further action on the defendant's part; and
(3) That the victim suffered serious bodily injury.

The essential elements necessary to constitute [f]irst [d]egree [m]urder are:

(1) That the defendant unlawfully killed the alleged victim; and
(2) That the defendant acted intentionally. A person acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim; and
(3) That the killing was premeditated.

Next, we must determine if a clear and unequivocal rule of law was breached. The State insists that a clear and unequivocal rule of law was not breached, pointing to the fact that there is no Tennessee case on point. The State cites cases from several other jurisdictions including *Kansas v. Patton*, 102 P.3d 1195, 1199-1200 (Kan. Ct. App. 2004), *People v. Bodley*, 195 N.W.2d 803, 805-06 (Mich. Ct. App. 1972), *Mitchell v. Texas*, 365 S.W.2d 804, 806 (Tex. Crim. App. 1963), and *Burcham v. State*, 338 So. 2d 1138, 1141 (Fla. 2d Dist. App 1976), to support their argument that a trial court is not required to give a specific definition of premeditation. The State argues that "lack of specific language in our statutes or case law" and "lack of uniformity in the decisions rendered in other jurisdictions" support the conclusion that a clear and unequivocal rule of law was not breached and that Defendant is therefore not entitled to plain error review.

Defendant, on the other hand, argues that because the trial court failed to define premeditation, the jury did not receive an instruction on each element of the offense. Defendant acknowledges that there are no Tennessee cases exactly on point and that there seems to be a split among authority in other jurisdictions that have addressed the issue. Defendant cites *Anderson v. State*, 276 So. 2d 17, 19 (Fla. 1973), and *People v. Milton*, 265 N.W.2d 397, 399 (Mich. Ct. App. 1978), to support his position. Despite a lack of clear

direction from a Tennessee court, Defendant insists that a clear and unequivocal rule of law was broken because the trial court failed to instruct the jury on all the elements of the offense of attempted first degree murder.

The United States Constitution and the Tennessee state constitution guarantee criminal defendants the right to trial by jury. U.S. Const. amend. VI; Tenn. Const. art. I, § 6 (providing "that the right of trial by jury shall remain inviolate"). This right includes an entitlement to a correct and complete charge of the law. *State v. Page*, 184 S.W.3d 223, 229 (Tenn. 2006) (citing *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)). "Any omission in the instructions in reference to an element of the offense which might lessen the burden of proof placed upon the state is constitutional error and requires a new trial unless the error is harmless beyond a reasonable doubt." *State v. Hill*, 118 S.W.3d 380, 385 (Tenn. Crim. App. 2002) (citing *State v. Walker*, 29 S.W.3d 885, 893-94 (Tenn. Crim. App. 1999)). "Jury instructions must be reviewed in their entirety." *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008) (citing *State v. Guy*, 165 S.W.3d 651, 659 (Tenn. Crim. App. 2004)). Whether the trial court properly instructed the jury on a certain offense is a mixed question of law and fact, which this Court reviews de novo with no presumption of correctness. *State v. Howard*, 504 S.W.3d 260, 267 (Tenn. 2016) (citing *State v. Thorpe*, 463 S.W.3d 851, 859 (Tenn. 2015)).

Trial courts have a duty to "instruct the jury on the general principles of law applicable to the facts of the case," which includes defining every element of the offense charged. *State v. Clark*, 452 S.W.3d 268, 294-95 (Tenn. 2014). "The words defining [an] offense . . . have a technical meaning and it is the trial court's duty to give such meaning to the jury in the charge and not merely to use the language of the statute" listing the elements of the offense. *Teel*, 793 S.W.2d at 249. Premeditation is an element of attempted first degree murder. *See* T.C.A. §§ 39-12-101, 39-13-202(a)(1); *State v. Banks*, 271 S.W.3d 90, 138-39 (Tenn. 2008). Premeditation is defined in Tennessee Code Annotated section 39-13-202(d) as:

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

We conclude that failure to give the jury the definition of premeditation was error. We must now determine if the error was harmless. "[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by

overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." *Neder v. United States*, 527 U.S. 1, 17 (1999). We are required to consider a particular instruction in the context of the trial court's charge as a whole. *Clark*, 452 S.W.3d at 295. "When a challenged instruction was so erroneous that the instruction alone infected the entire trial and resulted in a conviction that violates due process, or when the judge's charge, taken as a whole, failed to fairly submit the legal issues or misled the jury as to the applicable law, such deficiencies are prejudicial error that require reversal." *Id.* (internal citations omitted). The proper inquiry is not whether a guilty verdict would surely have been rendered in a trial without the error, but instead whether the guilty verdict rendered in the trial "was surely unattributable to error." *State v. Hollis*, 342 S.W.3d 43, 52 (Tenn. Crim. App. 2011) (internal quotations and citations omitted).

For guidance, we consider that this Court has affirmed a conviction where the trial court gave an additional instruction on premeditation which expanded the instruction rather than, as here, omitting the definition of premeditation entirely. *See State v. Vernon Motley*, No. W2010-01989-CCA-R3-CD, 2012 WL 1080479, at *5-6 (Tenn. Crim. App. Mar. 29, 2012), *perm. app. denied* (Tenn. Aug. 16, 2012); *cf. Hollis*, 342 S.W.3d at 52; *State v. Kenneth Spencer*, No. W2010-02455-CCA-R3-CD, 2011 WL 6147012, at *13 (Tenn. Crim .App. Dec. 8, 2011), *no perm. app. filed*; *State v. Elgie Sykes*, No. W2009-02296-CCA-R3-CD, 2011 WL 2732660, at *8 (Tenn. Crim. App. July 14, 2011), *no perm. app. filed* (remanding all three cases for a new trial, concluding that although sufficient evidence of premeditation, error was not harmless beyond a reasonable doubt).

In *Vernon Motley*, the trial court gave the jury an expanded instruction on premeditation during which the trial court listed factors that were indicative of premeditation. *Id.* at *5. On appeal, this Court determined that the trial court's instruction was not only incomplete, but constituted an impermissible comment on the evidence and was error. *Id.* This Court concluded that the error was harmless in light of the "overwhelming" proof of premeditation and that the verdict was "surely unattributable" to the erroneous instruction. *Id.*

Under the narrow facts of this case, we determine below in our discussion on sufficiency of the evidence that there was overwhelming proof of premeditation. Defendant used a deadly weapon on an unarmed victim, inflicted multiple gunshot wounds, returned to shoot at victim a second time and failed to render aid to the victim. *See State v. Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009); *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013). Because of the overwhelming proof of premeditation, we cannot say that the guilty verdict

was "surely attributable to the error" of the failure of the trial court to instruct the jury on the definition of premeditation. *Hollis*, 342 S.W.3d at 52. Therefore, the error is harmless.

Because we have determined that the error was harmless, consideration of the error is not necessary to do substantial justice. Because we are reviewing the issue for plain error, Defendant "bears the burden of persuading the appellate court . . . that the error was of sufficient magnitude that it probably changed the outcome of the trial." *Martin*, 505 S.W.3d at 505. Defendant has failed to do so. As a result, he is not entitled to plain error relief.

*Admissibility of Photographic Lineup*

Defendant argues that the trial court abused its discretion in admitting the photographic lineup into evidence because it was an unauthenticated replica and not the actual photographic lineup the victim viewed at the hospital. Moreover, Defendant insists that the error was not harmless because Defendant's identity was "hotly contested" by the defense. The State disagrees.

During trial, the victim testified that he met with the police twice after he was shot. The first time, he told police Defendant's name. On the second visit, the victim was in isolation in the ICU but was able to identify Defendant from a photographic lineup. The victim was shown a copy of the photographic lineup at trial and confirmed that it was identical to the lineup he was shown at the hospital. He admitted that the writing on the photographic lineup was not his handwriting but explained that he was unable to write on the photograph because his "left side [wa]s paralyzed, and [his] right hand [had been] amputated."

Similarly, Lieutenant Williams testified that he interviewed the victim at the hospital. During the first interview, about 40 days after the shooting, the victim identified Defendant by name. Lieutenant Williams put together a photographic lineup that included Defendant's picture and returned to the hospital. Lieutenant Williams explained that because Defendant was in isolation, visitors had to wear special clothing into the hospital room and that anything taken into the room had to be destroyed. Because he knew the photographic lineup taken into the hospital room would be destroyed, Lieutenant Williams prepared two identical photographic lineups. He presented one to a nurse who stood outside the door of the isolation unit. He presented the other one to the victim. As the victim identified the person who shot him as "number three," the nurse indicated as such on the copy she held outside the isolation room. At trial, Lieutenant Williams testified that the photographic lineup was an exact copy of the one viewed by the victim at the hospital. Counsel for Defendant objected to its admission, but the trial court overruled the objection.

Tennessee Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). "Authentication can be properly established by the testimony of a witness with knowledge that the 'matter is what it is claimed to be.'" *State v. Mickens*, 123 S.W.3d 355, 376 (Tenn. Crim. App. 2003) (citing Tenn. R. Evid. 901(b)(1)). The trial court is considered the "arbiter of authentication issues," and, a ruling on an authentication issue will not be disturbed absent a showing that the court clearly abused its discretion. *See* Tenn. R. Evid. 901, Advisory Comm'n Cmts.; *Mickens*, 123 S.W.3d at 376. A trial court abuses its discretion when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006), *overruled on other grounds by State v. Patterson*, 564 S.W.3d 423, 433 (Tenn. 2018); *see State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

Defendant argues that because Lieutenant Williams did not write on the photographic lineup, he could not authenticate the lineup. That is not what the rule requires. To be sure, Rule 901 provides that authentication may be made by the testimony of a witness with knowledge that "a matter is what it is claimed to be." Tenn. R. Evid. 901(b)(1). In this case, Lieutenant Williams importantly testified that he prepared two identical photographic lineups prior to presenting one lineup to the victim and one lineup to the nurse who observed the identification and that the photographic lineup being offered into evidence was identical to the one viewed by Defendant. Moreover, the victim identified the photographic lineup at trial as the lineup that he viewed at the hospital. In our view, the photographic lineup admitted into evidence at trial was sufficiently authenticated to support a finding by the trial court that it was an accurate copy of the photographic lineup actually viewed by the victim at the hospital. The trial court did not abuse its discretion. Defendant is not entitled to relief on this issue.

*Sufficiency*

Defendant challenges the sufficiency of the evidence to support his convictions for attempted first degree murder with serious bodily injury and employing a firearm during the commission of a dangerous felony. Specifically, Defendant argues that his identity was not proven and that the State failed to establish that he acted with premeditation. Again, the State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*,

443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Id.* (quoting *Bland*, 958 S.W.2d at 659). Therefore, the prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

### A. Attempted First Degree Murder with Serious Bodily Injury

In order to convict Defendant of attempted first degree murder with serious bodily injury, the State had to prove that Defendant acted "with the kind of culpability otherwise required for the offense . . . [and] [a]ct[ed] with intent to cause a result that is an element of the offense, and believe[d] the conduct w[ould] cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2). Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. § 39-13-202(a)(1). While serious bodily injury is not an element of attempted first degree murder, when a victim of attempted first degree murder suffers serious bodily injury as a result of the crime, a defendant must serve a minimum of 85% of his sentence. T.C.A. § 40-35-501(k)(5). "Serious bodily injury" includes bodily injury that involves: (A) a substantial risk of death; (B) protracted unconsciousness; (C) extreme physical pain; (D) protracted or obvious disfigurement; (E) protracted loss or substantial impairment of function of a bodily member, organ or mental faculty . . . . T.C.A. § 39-11-106(a)(36). "Protracted" means "delayed or prolonged in time." *State v Ronald L. Carroll*, No. E2013-01781-CCA-R3-CD, 2014 WL 1759101, at *5 (Tenn. Crim. App. Apr. 30, 3014), *perm. app. denied* (Tenn. Oct. 15, 2014). According to Tennessee Code Annotated section 39-11-106(a)(3) "bodily injury" includes a "cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ or mental faculty." This Court has held that the subjective nature of pain is a fact to be determined by the trier of fact. *State v. Eric A. Dedmon*, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App. Feb. 23, 2006), *no perm. app. filed*.

Premeditation is defined as "an act done after the exercise of reflection and judgment." T.C.A.§ 39-13-202(d). As noted above in our section on jury instructions, this section further defines premeditation as follows:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* The State must establish the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Premeditation may be proved by circumstantial evidence. *See, e.g.*, *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992). The existence of premeditation is a question of fact for the jury and may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Such circumstances include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, threats or declarations of an intent to kill, a lack of provocation by the victim, failure to aid or assist the victim, the procurement of a weapon, preparations before the killing for concealment of the crime, destruction and secretion of evidence of the killing, and calmness immediately after the killing. *State v. Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009); *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003); *Bland*, 958 S.W.2d at 660; *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013).

Here, the proof at trial, viewed in the light most favorable to the State, indicated that the victim spent time with Defendant prior to the shooting. After the victim was shot at his own house, he managed to make it to his neighbor's house for help. The victim explained that a car drove up, a car that he recognized as the car Defendant regularly drove, and Defendant exited the car and shot the victim two more times. The distance from which these shots were fired is unclear. The victim's testimony was that the shots were fired from 70-80 feet away, but the body camera footage from the police officer on the scene suggests that the distance from the neighbor's porch to the street is significantly less than 70-80 feet. When the police arrived, Defendant was in obvious pain but was coherent enough to identify Defendant by name as the shooter. Nevertheless, the jury heard the proof and was satisfied that Defendant's identity was proven. As to premeditation, the victim testified that Defendant shot him twice in the hand and then shot him in the head as he bent over to protect himself from further attack. Prior to leaving the victim's house, Defendant shot

him two more times. The victim made it his neighbor's house for help, only to be shot two more times by Defendant as he pulled into a nearby driveway. The victim was unarmed. The proof supports the jury's finding of premeditation and supports the conviction for attempted first degree murder. Defendant is not entitled to relief on this issue.

### B. Employing a Firearm During the Commission of a Dangerous Felony

Our review of the record indicates that the State set forth evidence at trial from which the jury could determine that Defendant employed a firearm during a dangerous felony. In order to sustain a conviction, the State had to show that Defendants employed a firearm during the commission of or attempt to commit a dangerous felony. T.C.A. § 39-17-1324(b)(1), (2). Attempt to commit first degree murder is a dangerous felony. *Id.* at (i)(1). The proof at trial showed that Defendant shot the victim multiple times. The evidence was sufficient. Defendant is not entitled to relief.

### Sentencing

Defendant complains about the length of his sentence and the trial court's application of various enhancement factors, including Tennessee Code Annotation section 40-35-114(2), (4), (5), (9), (10), and (14). The State, on the other hand, argues that the trial court sentenced Defendant to a within-range sentence and that even if the trial court erred in the application of some of the enhancement factors, the trial court did not abuse its discretion.

When a defendant challenges the length or manner of service of a within-range sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Bise*, 380 S.W.3d at 707. A trial court abuses its discretion in sentencing when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). This deferential standard does not permit an appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The defendant bears the burden of proving that the sentence is improper. T.C.A. § 40-35-101, Sentencing Comm'n Cmts. The weighing of various enhancement and mitigating factors is within the sound discretion of the trial court and we will not disturb the sentence even if we had preferred a different result. *Bise*, 380 S.W.3d at 709-10.

At the sentencing hearing, the trial court heard testimony from the victim about the extent of his injuries. The trial court also heard testimony from Defendant's mother. Ms. Scurlock testified that Defendant had never been in trouble and was in the Army Reserve prior to being arrested for these offenses.

The trial court determined that Defendant had no criminal history. The trial court also determined Defendant's "risk and needs assessment" indicated the risk associated with Defendant was "low as compared to others." The trial court applied enhancement factor (2), finding Defendant was "a leader in the commission of an offense involving two (2) or more criminal actors." T.C.A. § 40-35-114(2). Next, the trial court determined that the victim was particularly vulnerable because of a physical disability, applying enhancement factor (4). T.C.A. § 40-35-114(4). The trial court determined that the victim was "rendered disabled" by Defendant's first shots before Defendant shot the victim again on the porch of the neighbor's house. The trial court also determined that Defendant treated the victim with "exceptional cruelty," applying enhancement factor (5). T.C.A. § 40-35-114(5). Defendant contends that the crime for which he was convicted, attempted first degree murder, necessarily contemplates the type of injuries suffered by the victim and that the trial court misapplied this enhancement factor. The trial court also found that Defendant used a firearm during the commission of the offense and that Defendant had no hesitation about committing a crime when the risk to human life was high. T.C.A. § 40-345-114(9), (10). Finally, the trial court determined that Defendant abused a position of trust because he and the victim were close friends. *Id.* at (15). The trial court sentenced Defendant to a within-range sentence of twenty-five years for attempted first degree murder. Even if the trial court improperly considered enhancement factors, as alleged by Defendant, the "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act." *Bise*, 380 S.W.3d at 706. The trial court herein followed the proper sentencing procedures before sentencing Defendant to a within-range sentence. Defendant is not entitled to relief on this issue.

*Conclusion*

Although the trial court committed error by failing to instruct the jury as to the technical meaning of premeditation, the error was harmless. The judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE